The CITIZENS' COMMITTEE FOR ENVIRONMENTAL PROTECTION, an unincorporated association, Delaware & Raritan Canal Coalition, a non-profit corporation, New Jersey Citizens for Clean Air, Inc., a non-profit corporation, the League for Conservation Legislation, an unincorporated association, New Jersey Public Interest Research Group, a non-profit corporation, and Lake Nelson Association, a non-profit corporation, Plaintiffs,

v.

UNITED STATES COAST GUARD, United States Army Corps of Engineers, New Jersey Department of Transportation, and United States Environmental Protection Agency, Defendants.

Civ. A. No. 77–1719.

United States District Court,
D. New Jersey.

June 9, 1978.

Catherine K. White, Plainfield, N. J., for plaintiffs.

Robert J. Del Tufo, U. S. Atty. by Carl R. Woodward, III, Asst. U. S. Atty., Chief, Environmental Protection Div. Newark, N. J., for defendants U. S. Coast Guard, U. S. Army Corps of Engineers, and U. S. Environmental Protection Agency.

John J. Degnan, Atty. Gen. of the State of New Jersey by Steven A. Tasher, Deputy Atty. Gen., Trenton, N. J., for defendant New Jersey Dept. of Transp.

INTRODUCTION

OPINION

BARLOW, Chief Judge.

On August 18th, 1977, the plaintiffs initiated this lawsuit seeking injunctive and

declaratory relief concerning the construction of a two and one-quarter (2¼) mile freeway extension of New Jersey Route 18 from the foot of the Albany Street Bridge in New Brunswick to Metlars Lane-Leupp Lane in Piscataway Township. The defendants are the United States Coast Guard, the United States Army Corps of Engineers, and the United States Environmental Protection Agency (hereinafter referred to as the "federal defendants"), and the New Jersey Department of Transportation (hereinafter referred to as the "state defendant").

On August 22nd, 1977, the plaintiffs applied for an order to show cause and a temporary restraining order with respect to the project bids, which were scheduled to be opened by the state defendant on August 24th, 1977. The order to show cause regarding the issuance of a preliminary injunction was made returnable for September 6th, 1977. The application for a temporary restraining order was denied upon the state defendant's representation that construction would not begin before September 6th. On September 6th, the plaintiffs' renewed application for a temporary restraining order was denied. Evidentiary hearings on the plaintiffs' application for a preliminary injunction were held on September 6th, October 5th–6th, November 1st–3rd, and November 9th, 1977. By the consent of all counsel, the proceedings on the plaintiffs' application for a preliminary injunction were consolidated with the trial on the merits. Transcript, filed January 23rd, 1978, at 636 (hereinafter cited as "T"). See Fed.R.Civ.P. 65(a)(2). By April 24th, 1978, all parties had submitted proposed findings of fact and conclusions of law.

## I. FACTS

The Court's findings of fact are based on a review of the testimony presented at the evidentiary hearing and on a review of the numerous documents submitted by the parties. After setting out the general purposes of the Route 18 project, we will discuss those facts relevant to the plaintiffs' primary challenges to the project—namely, the sufficiency of the two federal permits authorizing certain aspects of the project and the sufficiency of the Environmental Impact/Section 4(f) Statement (hereinafter cited as EI/Section 4(f) Statement).

### A. Purposes of Route 18 Project.

Chapter 102 of the 1966 New Jersey Session Laws authorized the State Highway Commissioner to:

as soon as practical . . . add to the State highway system a new route beginning at Route 18 in New Brunswick and taking a northwesterly direction generally parallel to the Raritan river crossing the river in the Leupp lane-Metlars lane area and continuing to Route 22 in the vicinity of the westerly terminus of Greenbrook road, Greenbrook township, Somerset county together with spur to Route 287 in the vicinity of Metlars lane in the township of Piscataway.

Chapter 291 of the 1971 New Jersey Session Laws provided that the road established would be designated as a freeway. See N.J. Stat.Ann. 27:6–1 & 27:7A–1 to 7A–9.

The major long-term purpose of the Route 18 freeway extension project is to reduce the severely congested traffic patterns presently existing in the New Brunswick-Piscataway area. At the present time, all traffic on the completed Route 18 highway empties onto Albany Street, a city street. Through traffic on Route 18 and the New Brunswick central business district is now required to pass through a complex, rotary-type intersection at the New Brunswick end of the Albany Street Bridge and follow the stop-and-go city street routes through Highland Park and then onto River Road bordering Johnson Park. Neighborhoods south of the river in New Brunswick which are affected by this traffic are heavily populated and contain schools, churches, and residential and commercial buildings.

This intracity congestion is expected to be relieved by providing a traffic corridor to handle the out-of-city and through traffic more efficiently. The reduction of stop-and-go acceleration and deceleration should significantly reduce attendant air pollution.

In addition, the free-flowing corridor created by this project will allow greater efficiency in traffic between the two communities and the developing residential and industrial parks north of Highland Park and the growing service areas in East Brunswick. With the improvement of traffic flow, emergency service vehicles will receive more convenient and expedient access to their various destinations. Existing and future bus service in the area is also expected to improve and become more viable as a public service.

In addition, the new route will improve access among the five campuses of Rutgers University. At present, intercommunication among the Rutgers University campuses, located on opposite sides of the river and in New Brunswick, is by private car and University-sponsored shuttle buses, and these vehicles must compete with in-city and Route 18 traffic across the four-lane Albany Street Bridge or traffic on the narrow two-lane Landing Lane Bridge. The project, therefore, will relieve the stop-and-go traffic flow which contributes heavily to noise, engine emission pollution, and congestion and which increases the safety hazards to pedestrians. The highway is also expected to aid in conserving vehicle petroleum fuel. By providing a more direct route through the area, it will relieve the energy-consuming stop-and-go traffic conditions on the congested arterials and collector streets which now carry the Route 18 traffic.

The project will provide Rutgers University with a vital link between its five campuses within the New Brunswick area. In light of the fact that approximately 21,000 students are moved between these five campuses by the University's bus system or by private automobile, the absence of an adequate connection across the Raritan River creates severe traffic congestion and significant time loss for the students, faculty and staff who must move between these campuses in order to conduct routine business. This constricted crossing of the river has further resulted in the impairment of efficiency of numerous University operations. Additionally, decisions regarding the location of key University facilities, such as the University's new 8,400 seat athletic center in Piscataway Township adjacent to the projected right of way of proposed Route 18, have been closely tied to the expectation that the highway would be built to link these campuses. Delay in the construction of the instant project would serve to exacerbate the University's existing problems and frustrate the future development of the institution.

Additionally, a trend of serious deterioration is presently in evidence in the City of New Brunswick. Ever-increasing numbers of residents have fled the city and a substantial number of once-attractive neighborhoods are now slums or about to be slums. Large numbers of private businesses have left the New Brunswick area, thereby increasing unemployment and decreasing the tax base. Testimony adduced at trial delineates the aggressive effort of Johnson & Johnson and numerous groups of private citizens, businesses, the State University and other institutions to revitalize the City of New Brunswick. At present, more than one million dollars in private capital has been raised in the effort to formulate a comprehensive plan for the renewal of the city. The cornerstone of such plan is the decision by Johnson & Johnson to remain in the city and erect its new worldwide headquarters therein. Such decision would result in Johnson & Johnson's investment of more than $40,000,000. and yield more than one thousand new jobs for the area. Such investment is also expected to trigger private capital investment in the City of New Brunswick of more than $100,-000,000. However, the very lynchpin of all of the above plans for revitalization was the commencement of the instant project. In fact, Chairman Burke had indicated that if construction had not commenced on the Route 18 project in the fall of 1977, Johnson & Johnson would regrettably have been forced to pursue alternate plans to expand its facilities outside of New Brunswick, thereby eliminating all of the benefits to the city set forth above.

## B. *The Permit Process.*

The proposed Route 18 project involves the construction of a bridge across the Raritan River and the placement of fill in both the Raritan River and the Delaware and Raritan Canal. Consequently, the project calls into play the provisions of Sections 9 and 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401 & 403.[1] In the view of the state and federal defendants, the bridge across the Raritan River required the Coast Guard to issue a permit pursuant to Section 9[2] and the fill to be placed in the Raritan River and the Delaware and Raritan Canal required the Army Corps of Engineers to issue a permit pursuant to Section 10.

The history of the state defendant's Section 9 permit for the bridge to cross the Raritan River began in 1965. In that year, the state defendant was informed by the Army Corps of Engineers[3] that a point downstream of the proposed bridge site had long been accepted as the effective head of navigation of the Raritan River. In reliance upon this information, the state defendant thereafter sought a permit to place bridge piers from the New Jersey Department of Conservation and Economic Development (presently the New Jersey Department of Environmental Protection). The permit was issued on April 7th, 1970, and the state defendant commenced and completed the pier construction in 1970.

After the piers for the bridge were in place, the question of upstream navigability was brought to the attention of the United States Coast Guard, to which the responsibility for administering the bridge permit function had been transferred.[4] The Coast Guard, in coordination with the Corps of

---

1. Section 9 provides:

   It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army. 33 U.S.C. § 401.

   Section 10 provides:

   The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same. 33 U.S.C. § 403.

2. The Section 9 permit function falls to the Coast Guard because of the evolution of that section. Section 502 of the General Bridge Act of 1946, 33 U.S.C. § 525, granted the consent of Congress for the construction of any bridge over navigable waters if the bridge was approved by the Chief of the Army Corps of Engineers and the Secretary of the Army. Section 6(g) of the Department of Transportation Act of 1966, 49 U.S.C. § 1655(g), transferred jurisdiction over bridges to the Secretary of Transportation. The Coast Guard is part of the Department of Transportation, 49 U.S.C. § 1655(b)(1).

3. In 1965, the Army Corps of Engineers was still exercising the bridge permit function. See n. 2, *supra.*

4. See n. 2, *supra.*

Engineers, investigated the question of upstream navigability. On December 7th, 1971, the Raritan River was determined navigable to a point upstream of the proposed Route 18 crossing. The state defendant applied for a permit from the Coast Guard on May 11th, 1972, and construction was voluntarily stopped by the state defendant pending the Coast Guard's determination. At the time of the cessation of the construction, only the bridge piers had been placed in the river. The Coast Guard issued a public notice of the application for a permit on August 31st, 1972, and held a public hearing in New Brunswick on December 14th, 1972. Coast Guard investigation of the application included evaluation of the various alternative plans, consideration of views expressed at the public hearing and by written comments, review of information provided by organizations and expert agencies, numerous meetings with representatives of concerned organizations and on-site inspection.

Coast Guard investigation also included determination of the scope of Coast Guard responsibility for the project. More particularly a Memorandum of Agreement between the Coast Guard and the United States Army, Chief of Engineers, had been executed in order to clarify their respective areas of jurisdiction and responsibilities regarding the construction of bridges in navigable waters of the United States. *See* Plaintiffs' Trial Exhibit 1, Final EI/Section 4(f) Statement, Appendix F, at 13–17. The Coast Guard indicated that, in accordance with this Memorandum of Agreement, one permit was to be issued under Section 9 for the subject Route 18 project. It was further indicated that the permit to be issued by the Coast Guard would include the bridge in its entirety and work associated therewith, as defined in Sections 4.A and 4.B of the Memorandum of Agreement. *Id.* at 15.

The Coast Guard also indicated to the state defendant that the Coast Guard had responsibility under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* (NEPA), and Section 4(f) of the Department of Transportation Act of 1966, 49

U.S.C. § 1653(f), to assess the potential environmental impact of the permit action, including identification and assessment of impacts causally related to the bridge project. Since the Route 18 upgrading project was complete through the New Street intersection in New Brunswick, that intersection was determined by the Coast Guard to be the logical, most southerly beginning of its scope of responsibility. Route 18 had actually been constructed between New Street and the more northerly Albany Street Bridge; however, the Coast Guard was aware that approximately 1,000–1,500 feet of this portion was to be reconstructed to facilitate an interchange at the entrance to the Albany Street Bridge. The proposed intersection at Sutphen Road and Metlars Lane was determined by the Coast Guard as the logical northerly termination of Coast Guard scope of responsibility.

Pursuant to its responsibilities under NEPA, the Coast Guard met with state and local officials and concerned interest groups throughout investigation of the permit application and analyzed comments and information submitted to fully evaluate the opposing concerns and to seek, with the state defendant, methods of mitigating identified adverse impacts of the proposal. On June 29th, 1973, a draft EI/Section 4(f) Statement for the project was filed by the Coast Guard and made available to appropriate federal, state and local agencies and the general public in order to obtain their comments. The draft EI/Section 4(f) Statement thereafter accompanied the permit proposal through the Coast Guard's review processes. On July 16th, 1976, the project's final EI/Section 4(f) Statement was filed with the Council on Environmental Quality and likewise made available to the public. In addition, a supplement to the final EI/Section 4(f) Statement was prepared by the Coast Guard. The express purpose of this supplement was to provide additional information in order to permit the Commandant of the Coast Guard, as the delegatee of the United States Secretary of Transportation, to determine if there was

any feasible and prudent alternative to the project and if all possible planning to minimize damage to parkland and historic properties had been performed. On August 18th, 1976, after completion of the Coast Guard's NEPA-mandated environmental assessment process, Bridge Permit 36–73 was granted, approving the location and construction at the Route 18 bridge structure. *See* Plaintiffs' Trial Exhibit 14.

The history of the state defendant's Section 10 permit is somewhat less complicated. On September 20th, 1972, the state defendant applied to the Army Corps of Engineers for a permit authorizing, in general, the placement of fill along the Raritan River and in a section of the Delaware and Raritan Canal. On July 6th, 1977, the Army Corps of Engineers issued its Statement of Facts and Findings in relation to the state defendant's application. The Corps' findings were based, in part, on the final and supplemental EI/Section 4(f)

Statement prepared by the Coast Guard and on the Corps' own investigation. *See* Plaintiffs' Trial Exhibit 12. On July 8th, 1977, the Secretary of the Army authorized the state defendant to place fill and rip-rap and to construct a roadway, bikeway, walkway, retaining walls, water conduit, discharge and overflow pipes, spillway and portage area, all of which are in conjunction with the extension of Route 18. *See* Plaintiffs' Trial Exhibit 7.

## C. *The Environmental Impact/Section 4(f) Statement.*

As was indicated above, see text at page 106, *supra*, the Coast Guard, in conjunction with its Section 9 bridge permit function, had the primary responsibility for formulating the EI/Section 4(f) Statement for the Route 18 project.[5] The final and supplemental EI/Section 4(f) Statements comprise over four hundred pages. They con-

---

**5.** Section 102 of the National Environmental Policy Act states in part:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the pub-

lic as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes. . . .

42 U.S.C. § 4332.

Section 4(f) of the Department of Transportation Act of 1966 states in part:

(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

49 U.S.C. § 1653(f).

tain extended descriptions of the project, its probable impacts and proposed mitigating measures, and comments from various interested federal state and local governmental bodies, private organizations and individuals together with responses to the comments by the Coast Guard. Seven federal agencies commented on the draft EI/Section 4(f) Statement. Those agencies include the Advisory Council on Historic Preservation, the Army Corps of Engineers, the United States Environmental Protection Agency, the Federal Highway Administration, the Department of Health, Education and Welfare, the Department of Housing and Urban Development, and the Department of the Interior. Plaintiffs adduced no evidence that the draft or final EI/Section 4(f) Statements were not properly disseminated. Besides a description and drawings of the project, the final EI/Section 4(f) Statement examined and reviewed eleven separate alternatives to the project, including a variety of different alignments, mass transportation, and a "do-nothing" alternative. Each of the alternatives is described with sufficient detail and clarity to comprehend and compare them with the project.

At the hearing, the plaintiffs introduced testimony bearing on the adequacy of the final EI/Section 4(f) Statement's analysis of alternative alignments and analysis of hydrologic data. As for alternative alignments, the plaintiffs produced two witnesses: Mr. Willis Klotzbach and Mr. Cooper Bright. Mr. Klotzbach, a professional engineer, testified that, in his opinion, certain alternatives to the project had not been considered. However, Mr. Klotzbach also testified that he had not reviewed any of the supporting documentation to the final EI/Section 4(f) Statement, nor had he done any independent traffic analysis to support his conclusion that certain ramps of the project in the vicinity of the Rutgers campus should be eliminated. Mr. Klotzbach acknowledged that had he reviewed the study prepared by the consulting engineers to the state defendant, King and Gavaris, he would also have seen that, contrary to his original statement that only one interchange at the intersection of River Road and Metlars Lane was reviewed, in reality six separate configurations were studied.

Mr. Bright's testimony focused on the adequacy of the Coast Guard's analysis of a plan submitted by the now-defunct Center for Transportation Studies of the Eagleton Institute of Politics, Rutgers University. The plan was completely embodied in a document dated April 3rd, 1972, known as Center for Transportation Studies Report No. 28, An Alternate Highway Bridge Plan for Improving Route 18. This document was submitted to the Coast Guard and the state defendant and was thoroughly reviewed and evaluated by the consulting engineers, King and Gavaris, in preparing its analysis of alternatives to the project. Report No. 28 proposes widening the existing Albany Street Bridge, widening the existing two-lane River Road to four lanes from Raritan Avenue to Metlar's Lane, and, optionally, rebuilding the existing Landing Lane Bridge to accommodate the traffic which the project is designed to handle. The consulting engineer prepared, during the course of its environmental analysis, a rendering of the route advocated by Report No. 28, which was included in the final EI/Section 4(f) Statement.

Mr. Bright, who was responsible for the preparation of Report No. 28, believed that the route advocated in Report No. 28, as drawn by the consulting engineer, was not the route that his present organizations, the Rutgers Student Committee on Route Eighteen (RSCORE) and the Citizens Committee to Preserve the Delaware and Raritan Canal, Raritan River and Johnson Park had wanted evaluated. Mr. Bright did testify, however, that if Report No. 28 was evaluated by the consulting engineer, then the RSCORE plan was evaluated because every element of the RSCORE plan was contained within the report. The comments on the draft EI/Section 4(f) Statement by these two groups are included in the final EI/Section 4(f) Statement. The comments advocate a configuration which conforms to the description contained in Report No. 28. At no time prior to the issuance of the Coast Guard permit on August 18th, 1976, did Mr.

Bright or any of his organizations supply a drawing which delineated the specific proposal that he contends was not evaluated by interested governmental agencies. More than six months after the Coast Guard permit was issued, such a drawing was finally prepared and submitted on April 29th, 1977, to the Coast Guard and the Corps of Engineers. Comparison of the drawing, as explained by Mr. Bright's testimony, with the comments contained in the final EI/Section 4(f) Statement reveals considerable change in the RSCORE Report No. 28 proposal. For example, Report No. 28 advocated widening the Albany Street Bridge and a roadway passing *under* Raritan Avenue to deliver westbound traffic to River Road. This proposal was fully and carefully analyzed by the consulting engineer and the Coast Guard. The RSCORE drawing, however, advocates an *overpass* to accomplish the same function. At no time prior to the presentation of the RSCORE drawing to the Coast Guard is there any emphasis by Mr. Bright or his organizations on an overpass.

Further, the Coast Guard gave extensive and careful consideration to the various options contained in Report No. 28 and to their environmental detriments. With the exception of Mr. Bright, who is not a highway engineer and who has never built or designed highways, there is no evidence that the plan advocated in Report No. 28 was not analyzed and evaluated in accordance with applicable federal environmental laws. Indeed, even after the permit was issued the Coast Guard met with Mr. Bright on several occasions, reviewed and reanalyzed his plan, and even sought additional information from other governmental bodies. The end result was that the plan, with all its options, advocated by Report No. 28 was rejected as unable to fulfill the requirements of the project in an environmentally acceptable and functionally workable manner. Nonetheless, there was full and comprehensive evaluation.

Plaintiffs' criticism of the EI/Section 4(f) Statements' analysis of hydrologic data concerns the project's impact on flooding in the area. Separate hydrologic analyses were prepared by the consulting engineer and the Corps of Engineers. Review was also conducted by the Federal Highway Administration. All three groups concluded that the bridge construction and fill in the Raritan River will have negligible effect on floodwater levels and flood hazards in the project area. Plaintiffs adduced no evidence that these analyses were in any way defective or inaccurate.

One element of the final and supplemental EI/Section 4(f) Statements requiring closer consideration is a document identified as the Memorandum of Agreement.[6] *See* Final EI/Section 4(f) Statement, Appendix D at 2-7. As a result of concern over potential adverse effects of the project upon parkland and historic sites, the Coast Guard and the state defendant consulted with the Federal Advisory Council on Historic Preservation and with the New Jersey Historic Preservation Officer. In particular, the project was reviewed to consider prudent and feasible alternatives to avoid or satisfactorily mitigate the adverse effect upon the Delaware and Raritan Canal, Metlar House and Ivy Hall. The results of this consultative process have been formalized in the Memorandum of Agreement. It was therein mutually agreed that implementation of the project, in accordance with described stipulations, would satisfactorily mitigate any adverse effect on the above-named properties. The parties also stated that "[t]he provisions of this Memorandum of Agreement shall be reviewed annually by the signators until construction of Route 18 is complete". *Id.* at 5. The state defendant has provided assurance throughout the course of trial that it will continue to observe its pledge to comply with every step of mitigation set forth in the Memorandum of Agreement.

**6.** The Memorandum of Agreement discussed in this paragraph has no relationship to the Memorandum of Agreement executed between the Coast Guard and the Army Corps of Engineers. See text at page 106, *supra.*

The intent of the state defendant was to construct the proposed Route 18 project in several separate construction contracts to be staged progressively. The first contract will extend Route 18 from New Street to Hamilton Street in New Brunswick. The second major construction contract will provide for the completion of the bridge over the Raritan River with temporary connections to River Road in Piscataway and George Street in New Brunswick. It will also include certain measures of mitigation, particularly with regard to the Canal. The third major contract will complete the construction of Route 18 between Hamilton Street and the New Brunswick approach to the Raritan River Bridge, including the construction of a deck below the Rutgers University dormitories. The fourth and last contract will provide for construction of a full interchange at River Road. Completion of the entire project is expected in 1982. The implementation of any one required mitigation measure, therefore, has been and will be incorporated within that portion of the construction with which it is associated.

On October 12th, 1977, the Memorandum of Agreement was modified in the form of an addendum by all signatories. It provides that the state defendant would implement the mitigating measures relating to the Metlar House during the first phase of construction but in any event no later than during the first year of construction for the Route 18 project. It further notes that all

mitigative measures detailed in the Memorandum and Addenda will be accomplished before, or no later than, the time when the cultural resources involved are affected. It also provides that the state defendant will construct the conduit to insure Delaware and Raritan Canal water supply flow as follows: a. A 90-inch conduit to be constructed upstream of the Middlesex Water Company intake in order to provide the 120 million gallons per day upstream required capacity; and b. A 60-inch conduit to be constructed downstream from Middlesex Water Company in order to provide the 40 million gallons per day downstream required capacity. *See* Affidavit of Donald R. Goodkins, filed November 1st, 1977, Exhibit C. The utilization of these two conduits fully insures Middlesex County's future maximum capacity of 80 million gallons per day plus 40 million gallons per day for future downstream needs and flow control operational purposes.[7]

## II.  LEGAL DISCUSSION

We will consider the validity of the plaintiffs' various legal claims against the state and federal defendants separately.

### A.  *State Defendant.*

The plaintiffs appear to allege causes of action against the state defendant in paragraphs 6 and 9 of the Complaint's "claims" section. *See* Complaint, filed August 18th, 1977, "Claims", at ¶¶ 6 & 9.[8]

7. During the hearing, the plaintiffs contended that the Route 18 project involved the destruction of cultural resources not identified in the EI/Section 4(f) Statement or in the Memorandum of Agreement. It was readily apparent, after the testimony of Dr. Lorraine Williams of the New Jersey State Museum, that as of July 8th, 1977 (the date of the issuance of the permit by the Army Corps of Engineers), there were no historic and prehistoric sites in the project area on the inventory of the State Museum. In any event, under circumstances wherein an artifact is uncovered during the course of construction, the instant contract clearly provides that:

When the contractor's excavating operations encounter prehistoric remains or artifacts of historic or archeological significance, the operations shall be temporarily discontinued in

that area. The engineer will consult archeological authorities and determine the disposition of the remains or artifacts. The contractor agrees that he will make no claim for additional payment for extension of time because of any delays in or alteration of his procedure due to the removal of any such remains or artifacts.
T. at 615.

8. The plaintiffs also appear to allege claims against the state defendant in paragraphs 5, 7, and 10 of the Complaint's "claims" section. The claim asserted in paragraph 5 was withdrawn by the plaintiffs because of mootness. *See* T. at 610.

Paragraph 7 alleges that the state defendant, by placing bridge piers in the Raritan River in 1970, see text at page 107, *supra*, violated the Rivers and Harbors Appropriation Act of 1899,

### 1. *Plaintiffs' Sixth Claim.*

Paragraph 6 of the Complaint's "claims" section states: "The [state defendant] . . . is constructing Route 18 in violation of applicable federal law." Complaint, "Claims", at ¶ 6. In response to the state defendant's motion, the plaintiffs filed a more definite statement of claim 6. The more definite statement alleges that the state defendant is violating the following federal statutes: First, Section 9 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401, by constructing a "dam/dike in the Raritan River . . . without obtaining the requisite federal permit which requires the approval of the United States Congress, the authorization of the Secretary of the Army and the approval of the Chief of Engineers"; second, Section 9 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401, by constructing a "dam/dike in the Delaware and Raritan Canal . . . without obtaining the requisite federal permit which requires the approval of the United States Congress, the authorization of the Secretary of the Army and the approval of the Chief of Engineers"; and,

third, Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, by "creating an obstruction to the navigable capacity of waters of the United States . . . without the authorization of the United States Congress". Plaintiffs' More Definite Statement, filed October 14th, 1977, at ¶¶ 1–3.[9]

Thus, the plaintiffs' sixth claim, as clarified by the more definite statement, alleges that the state defendant has violated Sections 9 and 10 of the Rivers and Harbors Appropriation Act of 1899. We find, however, that the plaintiffs cannot obtain any relief under Sections 9 and 10 for three reasons: First, Sections 9 and 10 do not create a private right of action; second, even if these sections do provide a private right of action, this suit against the state defendant is barred by the Eleventh Amendment to the United States Constitution; and, third, even if these sections do provide a private right of action and even if this suit is not barred by the Eleventh Amendment, the state defendant has not, in fact, violated Sections 9 and 10 of the Rivers and Harbors Appropriation Act.

33 U.S.C. § 401, *et seq.*, and the Department of Transportation Act of 1966, 49 U.S.C. § 1651, *et seq.* In relation to the claim asserted under the Rivers and Harbors Appropriation Act, paragraph 7 is no more than a restatement of the fourth allegation of paragraph 6. *See* Plaintiffs' More Definite Statement, filed October 14th, 1977, at ¶ 4. This aspect of paragraph 7 will be discussed in conjunction with paragraph 6. Fed.R.Civ.P. 12(f). See n. 9, *infra.* In relation to the claim asserted under the Department of Transportation Act, plaintiffs have failed to refer the Court to a particular section of the Act which the state defendant is alleged to have violated. Moreover, plaintiffs have failed to cite any section of the Act which is applicable to the State of New Jersey or any of its departments under any circumstances. In any event, the plaintiffs, in their proposed findings of fact and conclusions of law, have not presented any arguments against the state defendant under the Department of Transportation Act. Consequently, the Court considers this aspect of paragraph 7 to have been abandoned at trial. *Sierra Club v. Morton*, 400 F.Supp. 610, 620 (N.D.Cal.1975).

Paragraph 10 alleges that:
The [state defendant] . . . intends to substantially deviate from project plans as submitted in support of its application for United States Coast Guard and United States Army Corps of Engineers in that the plans

specified a clover leaf intersection in Johnson Park, Piscataway, New Jersey and the [state defendant] . . . will/may not construct such an interchange, thereby creating an undetermined environmental impact not addressed by the Environmental Impact Statement.

Complaint, "Claims", at ¶ 10. The plaintiffs' proposed findings of fact and conclusions of law do not address this allegation concerning the Johnson Park interchange. Nor has our review of the transcript revealed any evidence concerning this allegation. Thus, we will consider paragraph 10 to have been abandoned at trial. *Sierra Club, supra,* 400 F.Supp. at 620.

**9.** The plaintiffs' More Definite Statement also alleges that the state defendant violated Section 9 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401, by constructing pillars in the Raritan River in 1970, see text at page 107, *supra,* before obtaining the required Section 9 permit. *See* Plaintiffs' More Definite Statement, at ¶ 4. The plaintiffs have not presented any arguments in support of this contention in their proposed findings of fact and conclusions of law. Consequently, the Court is treating this allegation as having been abandoned. *See Sierra Club v. Morton,* 400 F.Supp. 610, 620 (N.D.Cal.1975).

In *Red Star Towing and Transportation Co. v. Department of Transportation*, 423 F.2d 104 (3d Cir. 1970), the Third Circuit held that Sections 9 and 10 of the Rivers and Harbors Appropriation Act do not create a private right of action for damages. *Id.* at 105–06. In *Loveladies Property Owners Association, Inc. v. Raab*, 430 F.Supp. 276 (D.N.J.1975), *supplemental opinion*, Civ. No. 74–1549 (D.N.J., filed Feb. 3, 1976), *aff'd* 547 F.2d 1162 (3d Cir. 1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977), this Court, relying on *Red Star Towing*, held that the Rivers and Harbors Appropriation Act of 1899 did not create a private right of action where the relief sought was a mandatory injunction. The Court stated, in part, that:

> In substance, the Rivers and Harbors Act provides for the assessment of civil and criminal penalties against persons or corporations who, without authorization, perform some activity which might impede the navigability of the nation's waterways. The Act contains no express authorization of private civil actions. Nor can such a private remedy fairly be implied from the text and purpose of the Act.

*Loveladies Property Owners, supra*, 430 F.Supp. at 281. *See Township of Long Beach v. City of New York*, 445 F.Supp. 1203, 1211–12 (D.N.J.1978); *cf. Morris v. Tennessee Valley Authority*, 345 F.Supp. 321, 324 (N.D.Ala.1972); *Hooper v. United States*, 331 F.Supp. 1056, 1058 (D.Conn. 1971); *Guthrie v. Alabama By-Products Co.*, 328 F.Supp. 1140, 1144–49 (N.D.Ala.1971), *aff'd*, 456 F.2d 1294 (5th Cir. 1972), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973). *But see Sierra Club v. Morton*, 400 F.Supp. 610, 622–25 (N.D.Cal. 1975); *Citizens Committee for Hudson Valley v. Volpe*, 302 F.Supp. 1083, 1087–90 (S.D.N.Y.1969), *aff'd*, 425 F.2d 97 (2d Cir.), *cert. denied*, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970). We should add that the plaintiffs have made no attempt, in their briefs or in their proposed findings of fact and conclusions of law, to distinguish *Loveladies Property Owners, supra*, from this case. It seems clear, therefore, that Sections 9 and 10 of the Rivers and Harbors Appropriation Act cannot provide a basis for this private action against the state defendant.

Even if Sections 9 and 10 of the Rivers and Harbors Appropriation Act of 1899 do create a private right of action, this suit against the state defendant is barred by the Eleventh Amendment of the United States Constitution. The State of New Jersey may not be sued without its consent in a federal trial court by one of its own citizens under the Eleventh Amendment. *See, e. g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Duhne v. New Jersey*, 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280 (1920). A suit is regarded as one against a state if the named defendant is deemed to be an arm or alter ego of the state. *Harris v. Pennsylvania Turnpike Commission*, 410 F.2d 1332 (3d Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 558, 24 L.Ed.2d 497 (1970). The New Jersey Department of Transportation is clearly an alter ego of the State of New Jersey. *See, e. g., Red Star Towing, supra*, 423 F.2d at 105–06; *Citizens Committee for Hudson Valley v. Volpe*, 297 F.Supp. 809, 810–11 (S.D.N.Y.1969).

While a state may consent to be sued in federal court and thereby waive its Eleventh Amendment immunity, no waiver has been effected in the case at bar. As the United States Supreme Court pointed out in *Edelman*:

> Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a state has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction".

*Edelman, supra*, 415 U.S. at 673, 94 S.Ct. at 1361, *quoting Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909). Neither the Rivers and Harbors Appropriation Act nor the Department of

Transportation Act contain language by which such "overwhelming implications" may be drawn. As the court stated in the *Red Star Towing* case, when it ruled on this very issue: "[T]he mere entry of a State into a field of congressional regulation will not subject it to a suit by private individuals". *Red Star Towing, supra,* 423 F.2d at 106.

The plaintiffs' only attempt to address the sovereign immunity argument occurred during oral argument in this case. Plaintiffs' counsel stated: "With respect to the 11th Amendment claim, I believe that issue was dealt with in *Hudson River v. Volpe*". T. at 613. In *Citizens Committee for Hudson Valley v. Volpe, supra,* 297 F.Supp. 809, however, the court found that the Eleventh Amendment barred the suit against the state defendant in all respects except one. The one claim not prohibited was that a state statute violated the Fourteenth Amendment to the United States Constitution. *See id.* at 811–14; *Citizens Committee for Hudson Valley, supra,* 302 F.Supp. at 1087 n. 1. In the present case, the plaintiffs have not raised any constitutional issues. Therefore, even under the case cited by the plaintiffs, the relief sought against the state defendant is barred by the Eleventh Amendment.

In any event, even if Sections 9 and 10 of the Rivers and Harbors Appropriation Act create a private right of action and even if the Eleventh Amendment does not bar this suit against the state defendant, the plaintiffs have not shown that the state defendant is, in fact, violating Sections 9 and 10. Section 9 requires, in general terms, that a permit be obtained before the construction of a "bridge, dam, dike or causeway" over any navigable water of the United States. Section 10 requires that a permit be obtained before the creation of any obstruction in any navigable water of the United States. See text and footnotes at page 105, and n. 1, *supra.* In this case, a Section 9 permit was issued by the Coast Guard concerning the proposed bridge across the Raritan River. In addition, a Section 10 permit was issued by the Army Corps of Engineers concerning the fill to be placed in the Rari-

tan River and the Delaware and Raritan Canal.

■ The first violation alleged in the plaintiffs' sixth claim is that the state defendant is required to obtain a Section 9 permit for the fill to be placed in the Raritan River. See text at page 111, *supra.* In our view, however, a Section 9 permit is not required for this filling operation. The plaintiffs contend, relying primarily on *Citizens Committee for Hudson Valley, supra,* 302 F.Supp. 1083, that the fill to be placed in the Raritan River constitutes a dam or dike within the meaning of Section 9. The impact of *Citizens Committee for Hudson Valley,* however, has been substantially altered by the reasoning of *Petterson v. Resor,* 331 F.Supp. 1302 (D.Or.1971).

In *Petterson* the court, in ruling that the extension of an airport runway into the Columbia River, constructed of approximately thirty-three million cubic yards of fill dredged from the river, was not subject to Section 9, specifically noted that the court in *Citizens Committee for Hudson Valley* did not have available to it the evidence of legislative history and administrative practice that the *Petterson* court had received. *Id.* at 1306. Thus, the court concluded, the legislative history demonstrates a congressional intent to keep waterways free from *unreasonable* obstructions to navigation. *Id.* The court then cited numerous examples of fill projects which included work which could technically be called "diking" and stated: "To accept the plaintiffs' construction of Section 401 [Section 9] would make Section 403 [Section 10] meaningless because 'jetties', 'breakwaters', and 'fills', mentioned in Section 403, all come within plaintiff's (sic) dictionary definition of dikes." *Id.* The same analysis applies to activities which might be considered "dams". The critical question is whether the activity constitutes an unreasonable obstruction to navigation. *See id.* In the instant case, while the fill in the river obviously has some impact on the river's navigable capacity, the work cannot be considered an unreasonable obstruction to navigation.

As a practical matter, the Raritan River in the vicinity of the project does not presently serve as a "highway of commerce". *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871). Applying the test of *Petterson, supra*, the impact of the project on the actual navigation of the river must be considered negligible. Consequently, the determination of the Corps of Engineers that Section 9 does not apply to the Raritan River filling activities was fully justified.[10]

The second violation alleged in the plaintiffs' sixth claim is that the state defendant is required to obtain a Section 9 permit for the fill to be placed in the Delaware and Raritan Canal. See text at page 111, *supra*. The Canal ceased carrying commercial traffic early in this century and is in a serious condition of disrepair. The filling of this section of the Canal will have, at most, a negligible impact on the Canal's navigable capacity. *See Petterson, supra*, 331 F.Supp. at 1306. Accordingly, we do not feel that Section 9 applies to the filling activities to be conducted in the Canal.[11]

■ The third violation alleged in the plaintiffs' sixth claim is that the Section 10 permit, which allows the state defendant to place fill in the Raritan River and the Delaware and Raritan Canal, is invalid. See text at page 111, *supra*. The plaintiffs contend that Section 10 requires congressional consent before these filling operations can begin. The first clause of Section 10 does forbid the creation of any obstruction to the navigable capacity of any water of the United States without the affirmative authorization of Congress. *See* 33 U.S.C. § 403. The plaintiffs' position in this case, however, ignores the last two clauses of Section 10. See footnote 1, *supra*.

As the Supreme Court stated in *Wisconsin v. Illinois*, 278 U.S. 367, 412–413, 49 S.Ct. 163, 170, 73 L.Ed. 426 (1929):

The words 'affirmatively authorized by Congress' should be construed in the light of the administrative exigencies which prompted the delegation of authority in the succeeding clauses. Congress, having stated in Section 9 as to what particular structures its specific consent should be required, intended to leave to the Secretary of War, acting on the recommendation of the Chief of Engineers, the determination of what should be approved and authorized in the classes of cases described in the second and third clauses of Section 10. If the section were construed to require a special authorization by Congress whenever in any aspect it might be considered that there was an obstruction to navigable capacity, none of the undertakings specifically provided for in the second and third clauses of Section 10 could safely be undertaken without a special authorization of Congress. We do not think this was intended. The Supreme Court of Maine, in *Maine Water Co. v. Knickerbocker Steam Towage Co.*, 99 Me. 473, 59 A. 953, took the same general view in construction of the same section. It held that the broad words of the first clause of that section were not intended to limit the second and third clauses and that Congress's purpose was a direct prohibition of what was forbidden by them except when affirmatively approved by the Chief of Engineers and the Secretary of War. We concur in this view.

The true intent of the Act of Congress was that unreasonable obstructions to

---

10. The plaintiffs also rely on the case of *Sierra Club, supra*, 400 F.Supp. 610. A review of *Sierra Club's* discussion of Section 9 reveals that the court relied entirely on *Citizens Committee for the Hudson Valley. See Sierra Club*, 400 F.Supp. at 626–28. Therefore, we decline to follow *Sierra Club* for the same reasons that we decline to follow *Citizens Committee for Hudson Valley.*

11. Even if the fill to be placed in the canal does create an unreasonable obstruction to navigation, thus bringing the project within Section 9,

the plaintiffs' contention that the consent of Congress is required under Section 9 is incorrect. The canal lies entirely within the State of New Jersey. The legislation directing the construction of the Route 18 project, see text at page 103, *supra*, can be viewed as the "authority of the legislature of [the] State", 33 U.S.C. § 401, for the filling of the canal. Clearly, the state legislature has never contended that the state defendant is exceeding its statutory authority by filling the canal.

navigation and navigable capacity were to be prohibited, and in the cases described in the second and third clauses of Section 10, the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine what in the particular cases constituted an unreasonable obstruction.

This construction of Section 10 is sustained by the uniform practice of the War Department for nearly thirty years. Nothing is more convincing in interpretation of a doubtful or ambiguous statute. (Citations omitted).

Even the principal cases relied upon by plaintiffs concur with the above construction of Section 10. In *Sierra Club, supra,* 400 F.Supp. 610, the court followed the *Wisconsin v. Illinois* analysis, but concluded that in fact no actual Section 10 permits had been issued which authorized the contested projects. *See id.* at 633–35. In *United States v. Republic Steel Corp.,* 362 U.S. 482, 489, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), the Supreme Court specifically approved the *Wisconsin* ruling. Further, *Republic Steel* was a suit by the United States to enjoin the discharge of industrial waste, and its consequent obstruction to navigation, without a Section 10 permit from the Corps of Engineers. In the case at bar, the activity has been specifically permitted by authority of the Secretary of that Army. No authorization of Congress is required because the activity—namely, placement of fill in the river and the canal—falls explicitly within the purview of the third clause of Section 10, permits under which are specifically delegated to the Secretary. Accordingly, the plaintiffs are entitled to no relief based on their claim that the Section 10 permit authorizing the placement of fill in the Raritan River and the Delaware and Raritan Canal is invalid.

In summary, the plaintiffs are entitled to no relief against the state defendant under the Complaint's sixth claim because Sections 9 and 10 of the Rivers and Harbors Appropriation Act of 1899 do not create a private right of action, the relief sought is barred by the Eleventh Amendment, and the state has not, in any event, violated Sections 9 and 10.

2. *Plaintiffs' Ninth Claim.*

█ Paragraph Nine of the Complaint's "claims" section alleges that: "The [state defendant] . . . is not proceeding with all minimizing effects as specified in the Memorandum Agreement contained in the Environmental Impact Statement." Complaint, "Claims", at ¶ 9.[12] See text at page 109, *supra.* In our view, the plaintiffs cannot recover under their ninth claim because they lack the contractual and constitutional standing required to assert such a claim.[13]

Insofar as the plaintiffs' ninth claim concerns a breach of duty which may arise out of the Memorandum of Agreement, plaintiffs simply do not have the privity of contract essential to such an action. *See, e. g., Eadens v. New York Shipbuilding Corp.,* 382 F.2d 263, 264–65 (3d Cir. 1967). The Memorandum of Agreement to which plaintiffs refer was executed by the United States Coast Guard, the federal Advisory Council on Historic Preservation, the New Jersey Department of Transportation, and the New Jersey Historic Preservation Officer. Plaintiffs are neither signators to it, nor mentioned in it. The anticipatory nature of their claim renders plaintiffs' present standing more suspect. *Cf., Chamber of Commerce of United States v. Department of Interior,* 439 F.Supp. 762 (D.D.C.1977). Even if plaintiffs were parties to the Memorandum of Agreement, which

12. Paragraph 9 of the Complaint's "relief" section requests that the state defendant "post security in the amount of $18,000,000.00 to assure the funds necessary to comply with the provisions required to minimize environmental damage as set forth in the Environmental Impact Statement". Complaint, "Relief", at ¶ 9.

13. Even if the plaintiffs did have standing to bring this claim, the relief sought would be barred by the Eleventh Amendment. See text at pages 112–113, *supra.* In addition, there is absolutely no evidence that the Memorandum of Agreement has been, or will be, breached.

they do not even allege themselves to be,[14] it has long been stated that an anticipatory breach requires a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for performance in the contract arrives. *See, e. g., Dingley v. Oler,* 117 U.S. 490, 503–04, 6 S.Ct. 850, 29 L.Ed. 984 (1886). The plaintiffs have not pointed to any intention on the part of the state defendant to breach the terms of the Memorandum of Agreement.

▆ Moreover, plaintiffs fail to satisfy the threshold requirement of a "case" or "controversy" pursuant to Article III of the Constitution of the United States, insofar as they have failed to establish that they have suffered any injury in fact arising out of this Memorandum of Agreement. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Particularly, plaintiffs refer to a provision of the Memorandum dealing with the size of conduit used to transfer water from the Delaware and Raritan Canal. Complaint, "Factual Allegations", at ¶¶ 8 & 10. See text at page 110, *supra.* It was not alleged, and the proofs have failed to establish, how any injury in fact to plaintiffs may have arisen by way of

this provision. *Cf., Sierra Club v. Froehlke,* 486 F.2d 946, 954 (7th Cir. 1973); *Higginbotham v. Barrett,* 473 F.2d 745, 748–49 (5th Cir. 1973). Similarly, plaintiffs refer to the scheduling of mitigation work associated with the Metlar House, Complaint, "Factual Allegations", at ¶¶ 8 & 9; see text at page 110, *supra*; but plaintiffs have failed to allege or establish the manner by which such scheduling results in their harm, irreparable or otherwise. Lastly, plaintiffs allege that the Department of Transportation does not intend to remove the fill from or restore the Canal as previously agreed. Complaint, "Factual Allegations", at ¶¶ 8 & 9. Neither plaintiffs' pleadings nor proofs disclose the basis upon which they impute this intent to the Department; nor have plaintiffs alleged or established how they are presently suffering or have suffered any injury in fact as a result of this unfulfilled intent.

Accordingly, we conclude that the plaintiffs cannot recover against the state defendant under the complaint's ninth claim.

## B. *Federal Defendants.*

The plaintiffs allege claims against the federal defendants in paragraphs 1, 3, and 11 of the Complaint's "claims" section. Complaint, "Claims", at ¶¶ 1, 3, & 11.[15] We

---

**14.** Plaintiffs have not even alleged that they are third-party beneficiaries of the Memorandum of Agreement.

**15.** The Complaint also appears to allege claims against the federal defendants in paragraphs 2, 4, 5 and 10. Complaint, "Claims", at ¶¶ 2, 4, 5 & 10.

Paragraph 2 refers to an alleged violation of item 5(i) of the Memorandum of Agreement. Item 5(i) deals with the size of the conduit to be placed under the section of Route 18 covering the Delaware and Raritan Canal. Item 5(i) was modified, however, on October 12th 1977, to permit the use of the conduits presently intended for installation. See text at page 110, *supra.* In fact, the plaintiffs' proposed findings of fact and conclusions of law do not address the allegations contained in paragraph 2. Consequently, we are treating the claim asserted in paragraph 2 as having been abandoned. *See Sierra Club, supra,* 400 F.Supp. at 620.

Paragraph 4 alleges that: "The action of the United States Environmental Protection Agency in withdrawing its objections to the Route 18 project is unreasonable, arbitrary and capricious." Complaint, "Claims", at ¶ 4. The Environmental Protection Agency withdrew its objections to the project in a letter dated June 23rd, 1977, which stated in part: "[F]urther delay in this project is envisioned to cause irreparable social and economic damage to the future of New Brunswick, therefore, the Agency will withdraw its objections to the project as it appears that there is no readily implementable alternative at this time." Plaintiffs' Trial Exhibit 6. Given these reasons, we could hardly say that the Environmental Protection Agency's decision was arbitrary or capricious. In any event, the plaintiffs have failed to address the allegations of paragraph 4 in their proposed findings of fact and conclusions of law. Consequently, we are treating the claim asserted in paragraph 4 as having been abandoned. *See Sierra Club, supra,* 400 F.Supp. at 620.

will consider whether the plaintiffs are entitled to relief under any of the theories advanced against the federal defendants.

### 1. *Plaintiffs' First Claim.*

■ Paragraph 1 of the Complaint's "claims" section alleges that: "The United States Coast Guard has failed to meet the statutory burden imposed by Sec. 4(f) of the Department of Transportation Act with respect to 'no feasible and prudent alternatives' and 'planning to minimize harm'." Complaint, "Claims", at ¶ 1. Section 4(f) of the Department of Transportation Act of 1966 states in part:

> After August 23, 1968, the Secretary [of Transportation] shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

49 U.S.C. § 1653(f).[16] The Route 18 project involves the taking of public parkland and will have an adverse impact on historic sites, bringing it within the ambit of Section 4(f).

The Court's scope of review of administrative decisions under Section 4(f) has been defined as follows:

> [T]he court is to consider first, "whether the Secretary acted within the scope of his authority" and, second, whether the ultimate decision was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" In applying the arbitrary standard, the court

must "engage in a substantial inquiry" in order to determine whether the agency, in its conclusions, made a good faith judgment, after considering all relevant factors, including possible alternatives or mitigative measures. In passing on such "good faith" administrative judgment, the court specifically is "not empowered to substitute its judgment for that of the agency." (Footnotes omitted.)

*Coalition for Responsible Regional Development v. Coleman*, 555 F.2d 398, 399–400 (4th Cir. 1977), *quoting Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Consequently, our task is to determine whether the decision of the Coast Guard, acting on behalf of the Secretary of Transportation, that the Route 18 project has no feasible and prudent alternatives and that the project contains all possible planning to mitigate harm was arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A).

In relation to the feasible and prudent alternatives issue, the plaintiffs appear to contend that the Coast Guard failed to give adequate consideration to the following three factors: First, the alternative alignment suggested by Cooper Bright; second, the hydrologic data associated with the project; and, third, the alternative of constructing the Route 18 project to something less than freeway standards.

As for the Bright alternative, it seems clear that the Coast Guard reviewed the essential elements of the proposed alignment in the form of the Center for Transportation Studies Report No. 28. See text at pages 108–109, *supra*. Furthermore, the plaintiffs have presented little or no evidence of how the Bright alternative would reduce the project's adverse impact on the areas specified in Section 4(f). Even if we felt that the Bright alternative was superior to the alignment actually accepted, which we do not, this Court could not possibly conclude that the rejection of the

---

Similarly, we are treating the allegations contained in paragraphs 5 and 10 as having been abandoned. See n. 2, *supra*.

16. For the complete text of § 4(f) see n. 5, *supra*.

Bright alternative was arbitrary, capricious, or an abuse of discretion.

The plaintiffs' claim concerning the Coast Guard's analysis of hydrologic data seems to center on the placement of the River Road interchange and the placement of two ramps, identified as "U" and "E". *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at 9. The plaintiffs assert that the interchange could be moved to higher ground, thus removing it from the "flood plain". As for the ramps, the plaintiffs contend that ramp "U" will be flooded at the 100-year flood level and that ramp "E" will be flooded at the 50-year flood level.[17] We are not at all certain that the potential flooding of the interchange and ramps in question falls under Section 4(f). The inquiry mandated by Section 4(f) concerns the impact of highway construction on parklands, historic sites, and the like. The fact that sections of the project may, at some future date, become flooded for short periods of time seems irrelevant to Section 4(f).[18] In any event, the flooding issues raised by the plaintiffs, and the hydrologic effect of the project in general, were considered by the consulting engineer, the Army Corps of Engineers, and the Federal Highway Administration. All three groups concluded that the project would have a negligible impact on flood hazards in the project's area. See text at page 110, *supra*. Thus, even if Section 4(f) applies, we could hardly conclude that the decision to approve the placement of the interchange and the two ramps was arbitrary, capricious, or an abuse of discretion merely because they may be flooded once in fifty to one hundred years.

■ The plaintiffs' final argument in support of their first claim is that the Coast Guard violated Section 4(f) by failing to adequately consider the possibility of constructing the Route 18 project to something less than freeway standards. This argument apparently had its genesis in a memorandum, dated April 2nd, 1976, from the office of the Secretary of Transportation to the Coast Guard. Plaintiffs' Trial Exhibit 9. The memorandum, written by the Assistant Secretary for Environmental Safety and Consumer Affairs after reviewing the final EI/Section 4(f) Statement, requests the Coast Guard to provide additional discussion of certain aspects of the 4(f) Statement. Apparently, the supplemental EI/Section 4(f) Statement was generated as a response to this memorandum. One area on which additional discussion was requested was the following:

> The basis for the assumption that Route 18 must be constructed to freeway standards. Although these standards were proposed by the New Jersey legislature, there is no basis in the Environmental Impact Statement for determining that adjustments from those standards to minimize adverse impacts are not feasible. It appears that this segment will be the only portion of Route 18 designed to freeway standards and could cause safety problems at both ends. Thus, alternatives involving smaller scale and lower design standards should be considered as means to minimize adverse impacts.

Plaintiffs' Trial Exhibit 9, at 3.

The supplemental EI/Section 4(f) Statement does not specifically address the question of why the Route 18 project has to be constructed to freeway standards. From this fact, the plaintiffs appear to conclude that the Coast Guard's decision to approve the project was arbitrary, capricious, or an abuse of discretion. We disagree. To begin with, the April 2nd, 1976, memorandum is merely an internal communication between two sections of the Department of

---

**17.** As we understand it, the 50-year flood level is an estimate for the greatest flood that is likely to occur within fifty years. Similarly, the 100-year flood level is an estimate for the greatest flood that is likely to occur within one hundred years.

**18.** The plaintiffs may be arguing that the flooding issue relates to the adequacy of the EI/Section 4(f) Statement under some unspecified section of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* We note that the plaintiffs' only claim based on NEPA is made in paragraph 11 of the Complaint's "Claims" section. See text at pages 119–120, *infra.*

Transportation. The Coast Guard's failure to specifically address the concern of the Assistant Secretary does not, in itself, render the Coast Guard's decision arbitrary, capricious, or an abuse of discretion. A review of the supplemental EI/Section 4(f) Statement suggests that the Coast Guard concluded, based on the level of service required to satisfy the traffic needs of the area, that a freeway-type project was necessary. *See* Plaintiffs' Trial Exhibit 2, Supplemental EI/Section 4(f) Statement, at 2–8. Furthermore, if the Assistant Secretary was still dissatisfied with the Coast Guard's discussion of the need for a freeway-type project, another memorandum would probably have been forthcoming. In any event, plaintiffs have not shown that a non-freeway project, sufficient to satisfy the area's traffic needs, would in any way reduce the adverse impact on historic sites, parklands, and the like. Accordingly, we cannot say that the Coast Guard's failure to specifically discuss the need for a freeway-type project renders its decision to approve the project, through the grant of the bridge permit, arbitrary, capricious, or an abuse of discretion.

### 2. *Plaintiffs'. Third Claim.*

Paragraph 3 of the Complaint's "claims" section states:

> The United States Army Corps of Engineers has issued permit # 10,189 thereby approving plans for the construction of a dam and/or dike in a canal and/or navigable water of the United States without the requisite Congressional or legislative authority in contravention of Sec. 9 of River and Harbor Act of 1899 and is thereby permitting the creation of an obstruction to the navigable capacity of waters of the United States without the requisite U.S. Congressional authority in contravention of Sec. 10 of River and Harbor Act of 1899.

Complaint, "Claims", at ¶ 3.

While it is not entirely clear, this claim appears to deal solely with the fill to be placed in the Raritan River and the Delaware and Raritan Canal. As we have discussed above, Sections 9 and 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401 & 403, do not provide these plaintiffs with a private right of action. See text at page 112, *supra*. Furthermore, even if there is a private right of action, Sections 9 and 10 have not been violated. See text at pages 113–115, *supra*. Accordingly, the plaintiffs are not entitled to any relief against the federal defendants under the Complaint's third claim.

### 3. *Plaintiffs' Eleventh Claim.*

■ Paragraph 11 of the Complaint's "claims" section states: "The Environmental Impact Statement does not treat the proposed Route 18 in its entirety and the Environmental Impact Statement addresses only a segment of the highway and not the length authorized by N.J.S.A. 27:6–1, as amended 1971." Complaint, "Claims", at ¶ 11.

The project subjected to the NEPA, 42 U.S.C. § 4321, *et seq.*, review process extends Route 18 from its present *terminus*, the Albany Street Bridge in New Brunswick, across the Delaware and Raritan Canal and the Raritan River to the intersection of Sutphen Road and Metlars Lane. Although the New Jersey legislature has authorized the extension of Route 18 to Route 287, see text at page 103, *supra*, the state defendant has no specific project in mind. Presently, such an extension is speculative at best, with no guarantee that it will ever be built.

Highway construction is by necessity an incremental process. Financial considerations and the nature of highways require that construction begin at a certain point and end at a certain point, even though long-range plans exist for an entire statewide network of highways. This process is to some extent inconsistent with the all-encompassing environmental review required by NEPA. The courts have responded by balancing these two considerations and have found "as a practical matter it is necessary to permit the division of a state highway plan into segments for the purpose

of environmental consideration". *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 19 (8th Cir. 1973).

The courts have established three criteria to determine the proper length of a segment to be considered in an environmental impact statement: First, whether the segment connects logical termini; second, whether the segment has an independent utility; and, third, whether the length of the segment assures an adequate opportunity for consideration of the alternatives to the proposed action. *See, e. g., Patterson v. Exon*, 415 F.Supp. 1276, 1283 (D.Neb.1976); *Daly v. Volpe*, 376 F.Supp. 987, 993 (W.D. Wash.1974), *aff'd*, 514 F.2d 1106 (9th Cir. 1975).

Because the project meets these criteria, the scope of Coast Guard review as embodied in the EI/Section 4(f) Statement satisfies the requirements of NEPA. This segment of Route 18 has logical termini. The project will run from the existing freeway section of Route 18 which dumps traffic into downtown New Brunswick. The segment terminates across the canal and river at Sutphen Road and Metlars Lane, where the Route 18 freeway traffic will disperse along several suburban roads. *See* Final EI/Section 4(f) Statement, at 3. Highway segments designed to bypass congested urban areas have been held to have logical termini for the purpose of NEPA review. *See Daly, supra*, 376 F.Supp. at 993; *Citizens for Mass Transit Against Freeways v. Brinegar*, 357 F.Supp. 1269 (D.Ariz.1973).

The proposed highway segment will serve three major functions which clearly establish independent utility.

The functional purposes of the proposed segment are to (1) remove Route 18 through traffic from the arterial and city streets of New Brunswick, Piscataway and Highland Park; (2) provide a free-flowing route for residents of the New Brunswick-Piscataway-Highland Park urban area; and (3) provide a free-flowing corridor which can be used to link the five Rutgers University campuses and the communities with developing industrial parks north of Highland Park, growing service areas in East Brunswick, and the central business district of New Brunswick.

Final EI/Section 4(f) Statement at 3. See text at pages 103–105, *supra*. Such purposes have been held to establish independent utility. *See, e. g., Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, 376 F.Supp. 806, 813–14 (D.Conn.), *aff'd*, 503 F.2d 601 (2d Cir. 1974), *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975).

The federal action in this case consists of giving the State of New Jersey permits to fill the canal and build a bridge across the river. The alternatives to this project which utilize a different terminus than Metlars Lane have been given detailed analysis and rejected. *See* Final EI/Section 4(f) Statement, at 33. Furthermore, the terminus at the Sutphen Road and Metlars Lane intersection does not commit alignment alternatives for any future extension of Route 18. *See id.* at 3. Thus the constructing of the project as proposed and approved will not coerce any particular extension of Route 18.

Accordingly, the plaintiffs are not entitled to any relief against the federal defendants under the Complaint's eleventh claim.[19]

## CONCLUSION

Accordingly, in light of the foregoing, the Court will enter judgment in favor of all of the defendants and against the plaintiffs, on all of the claims. The foregoing consti-

---

**19.** The plaintiffs, in their proposed findings of fact and conclusions of law, raise, for the first time, claims that the EI/Section 4(f) Statements somehow violate the requirements of Section 106 of the National Historic Preservation Act of 1966, 16 U.S.C. § 470f, and Sections 2 and 3 of the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 662 & 663. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at 13–14. Clearly, these issues were never raised in the pleadings. Nor were these issues "tried by [the] express or implied consent of the parties". Fed.R.Civ.P. 15(b). Accordingly, it would be inappropriate for the Court to consider these claims at this late date.

tutes our findings of fact and conclusions of law.  Fed.R.Civ.P. 52(a).