## WILLAMETTE IRON BRIDGE COMPANY *v.* HATCH.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

No. 80.  Argued November 28, 29, 1887. — Decided March 19, 1888.

On a pure bill of review nothing will avail for a reversal of the decree but errors of law apparent on the record.

There must be a direct statute of the United States in order to bring within the scope of its laws obstructions and nuisances in navigable streams within a state; such obstructions and nuisances being offences against the laws of the States within which the navigable waters lie, but no offence against the United States in the absence of a statute.

The provision in the "act for the admission of Oregon into the Union," 11 Stat. 383, c. 33, § 2, that "all the navigable waters of said State shall be common highways and forever free, as well to the inhabitants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor," does not refer to physical obstructions of those waters, but to political regulations which would hamper the freedom of commerce.

Until Congress acts respecting navigable streams entirely within a state, the State has plenary power; but Congress is not concluded by anything that the State or individuals by its authority or acquiescence may have done, from assuming entire control, and abating any erections that may have been made, and preventing any other from being made except in conformity with such regulations as it may impose.

The appropriation by Congress of money to be expended in improving the navigation of the Willamette River was no assumption of police power over it.

Congress by conferring the privilege of a port of entry upon a municipality, does not come in conflict with the police power of a State exercised in bridging its own navigable rivers below such port. *Passaic Bridge Cases*, 3 Wall. 782, 793, App. applied.

*State of Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 13 How. 518, distinguished.

BILL OF REVIEW. Decree dismissing the bill. Complainant appealed. The case is stated in the opinion of the court.

*Mr. John Mullan* for appellant. *Mr. Rufus Mallory* filed a brief for same.

*Mr. J. N. Dolph* for appellees.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a bill of review filed by the appellants, a corporation of Oregon, to obtain the reversal of a decree made by the court below against them in favor of Hatch and Lownsdale, the appellees. The case is shortly this: On the 18th of October, 1878, the legislature of Oregon passed an act entitled "An act to authorize the construction of a bridge on the Willamette River between the city of Portland and the city of East Portland, in Multnomah County, State of Oregon;" by which it was enacted as follows, to wit: "*Be it enacted*, &c., That it shall be lawful for the Portland Bridge Company, a corporation duly incorporated under and in conformity with the laws of the State of Oregon, or its assigns, and that said corporation or its assigns be and are hereby authorized and empowered to construct, build, maintain, use, or cause to be constructed, built and maintained or used, a bridge across the Willamette River between Portland and East Portland in Multnomah County, State of Oregon, for any and all purposes of travel or commerce, said bridge to be erected at any time within six years after the passage and approval of this act, at such point or location on the banks of said river, on and along any of the streets of either of said cities of Portland and East Portland as may be selected or determined on by said corporation or its assigns, on or above Morrison Street of said city of Portland and M

Street of said city of East Portland, the same to be deemed a lawful structure: Provided, that there shall be placed and maintained in said bridge a good and sufficient draw of not less than one hundred feet in the clear in width of a passage way, and so constructed and maintained as not to injuriously impede and obstruct the free navigation of said river, but so as to allow the easy and reasonable passage of vessels through said bridge; and provided, that the approaches on the Portland side to said bridge shall conform to the present grade of Front Street in said city of Portland."

In the month of July, 1880, the appellants, the Willamette Iron Bridge Company, claiming to be assignees of the Portland Bridge Company, and to act under and by authority of said law, began the construction of a bridge across the Willamette River from the foot of Morrison Street, in the city of Portland, and proceeded in the work so far as to erect piers on the bed of the river, with a draw pier in the channel on which a pivot draw was to be placed with a clear passage way on each side, when open, of 100 feet in width, or, as the appellants allege, 105 feet in width.

On the 3d of January, 1881, whilst the appellants were thus engaged in erecting the bridge, Hatch and Lownsdale filed a bill in the Circuit Court of the United States for an injunction to restrain the appellants from further proceeding with the work, and to compel them to abate and remove the structures already placed in the river. This bill described the complainants therein as citizens of the United States residing at Portland, in the State of Oregon, and the defendants as a corporation organized under the laws of that State, having its office and principal place of business at Portland, and alleged that the Willamette River is a known public river of the United States, situate within the State of Oregon, navigated by licensed and enrolled and registered sea-going vessels engaged in commerce with foreign nations and with other States, upon the ocean and by way of the Columbia River, also a known public and navigable river of the United States, from its confluence with the Columbia River to the docks and wharves of the port of Portland, and that, up to and beyond the wharves and ware-

houses of the complainants, Hatch and Lownsdale, it is within the ebb and flow of the ocean tides. That, by the act of Congress of February 14th, 1859, admitting the State of Oregon into the Union, it is declared "that all the navigable waters of said State shall be common highways and forever free, as well to the inhabitants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor." 11 Stat. 383. That Congress has established a port of entry at the city of Portland, on the Willamette River, and has required vessels which navigate it to be enrolled and licensed, etc., and has frequently directed the improvement of the navigation of the said river, and appropriated money for that purpose; and by an act approved February 2d, 1870, giving consent to the erection of another bridge across said river from Portland to East Portland, asserted the powers of the United States to regulate commerce upon said river and to prevent obstruction to the navigation of the same, and in said act declared: "But until the Secretary of War approves the plan and location of said bridge and notifies the said corporation, association, or company of the same, the bridge shall not be built or commenced." The complainants further stated that Lownsdale was the owner and Hatch the lessee of a certain wharf and warehouses in Portland, situated about 750 feet above the proposed bridge, heretofore accessible to and used by sea-going vessels and others; and that Hatch is the owner of a steam tow-boat, used for towing vessels up and down the river to and from the said wharves and warehouses and others in the city; that vessels of 2000 tons have been in the habit of navigating the river for a mile above the site of the proposed bridge; and that the said river ought to remain free and unobstructed. But they charge that the bridge and piers will be a serious obstruction to this commerce; that the passage ways will not be sufficient for sea-going vessels with their tugs; that the bridge is being constructed diagonally, and not at right angles, to the current of the river; that it will arrest and pile up the floating ice and timber in high stages of water in such a way as to obstruct the passage of vessels; and, in various other particulars stated in the bill. it is charged that the bridge will be a

serious obstruction to the navigation of the river. The complainants contended that the act of the legislature, authorizing the bridge, contravenes the laws of the United States declaring the river free, and was not passed with the consent of Congress, and was a wrongful assumption of power on the part of the State; and alleged that the pretended assignment by the Portland Bridge Company to the defendants (the Willamette Iron Bridge Company) was not in good faith, and was not authorized by the directors of the former; and stated various other matters of alleged irregularity and illegality on the part of the Portland Company and the defendants. They also stated that the bridge was not being constructed in conformity with the requirements of the state law; that by reason of its diagonal position across the river, the thread of the current formed an acute angle with the line of the bridge, and that the draws do not afford more than 87 feet of a passage way for the passage of vessels; and that vessels will be unable to pass through said bridge for at least four months of the busiest shipping season of the year.

The defendants in that case, the Willamette Iron Bridge Company, filed an answer in which they admitted that they were building the bridge, and claimed to do so as assignees in good faith of the Portland Bridge Company, under and by virtue of the act of the legislature before mentioned, but denied the allegations of the bill with regard to the injurious effects of the bridge upon the navigation of the river, and averred that they were complying in every respect with the state law.

The cause being put at issue, and proofs being taken on the 22d of October, 1881, a decree was made in favor of the complainants for a perpetual injunction against the building of the bridge, and for an abatement of the portion already built. The decision of the case was placed principally on the ground that the bridge would be, and that the piers were, an obstruction to the navigation of the river, contrary to the act of Congress passed in 1859, admitting Oregon into the Union, and declaring "that all the navigable waters of the said State shall be common highways, and forever free, as well to the inhabi-

tants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor;" and that, without the consent of Congress, a state law was not sufficient authority for the erection of such a structure; and, even if it was, the bridge did not conform to the requirements of the state law.　See *Hatch* v. *Willamette Iron Bridge Co.*, 7 Sawyer, 127, 141.　The defendants took an appeal which was not prosecuted; but after the decision of this court in the case of *Escanaba Co.* v. *Chicago*, 107 U. S. 678, they filed the present bill of review for the reversal of the decree.

The reasons assigned for reversal are, amongst others, that the court erred in holding and decreeing as follows, to wit:

1st. That the bridge, where and as being constructed, was a serious obstruction to the navigation of the Willamette River, contrary to the act of Congress of February 14th, 1859, admitting the State of Oregon into the Union, which declares that all the navigable waters of the State shall be common highways and forever free to all citizens of the United States.

2d. That the said court, under § 1 of the act of March 3d, 1875, giving it jurisdiction of a suit arising under an act of Congress, has authority to restrain parties from violating said act by obstructing the navigation of any of said waters at the suit of any one injured thereby.

3d. That the proposed bridge is and will be a nuisance and serious impediment to the navigation of said river.

4th. That the legislature of the State of Oregon has not the power to say absolutely that a bridge may be built with only a draw of one hundred feet.

5th. That the Willamette Iron Bridge Company, as the assignee of the Portland Bridge Company, was not authorized by the act of the legislative assembly of Oregon to construct the said bridge, because it would be a violation of the said act of Congress of February 14th, 1859, admitting the State of Oregon in the Union, and was and is, therefore, void.

6th. That the defendant should be perpetually enjoined from constructing or proceeding with the construction of said bridge; and

7th. That the defendant should be required to abate and re- move out of said river all piers, foundations, &c., which it has placed or constructed therein.

This bill was demurred to, and the court affirmed the decree in the original suit and dismissed the bill of review. *Willamette Iron Bridge Co.* v. *Hatch*, 9 Sawyer, 643; *S. C.* 19 Fed. Rep. 347. The present appeal is taken from this decree.

On a pure bill of review, like the one in this case, nothing will avail for a reversal of the decree but errors of law appar- ent on the record. *Whiting* v. *Bank of the United States*, 13 Pet. 6; *Putnam* v. *Day*, 22 Wall. 60; *Buffington* v. *Harvey*, 95 U. S. 99; *Thompson* v. *Maxwell*, 95 U. S. 391, 397; *Beard* v. *Burts*, 95 U. S. 434; *Shelton* v. *Van Kleeck*, 106 U. S. 532; *Nickle* v. *Stewart*, 111 U. S. 776. Does any such error appear in the present case? The court below has decided in the nega- tive. We are called upon to determine whether that decision was correct. It must be assumed that the questions of fact, at issue between the parties, were decided correctly by the court upon its view of the law applicable to the case. But the important question is, was its view of the law correct? The parties in the cause, both plaintiffs and defendants, were citi- zens of the State of Oregon. The court therefore must neces- sarily have held, as we know from its opinion that it did hold, that the case was one arising under the constitution or laws of the United States.

The gravamen of the bill was, the obstruction of the naviga- tion of the Willamette River by the defendants, by the erec- tion of the bridge which they were engaged in building. The defendants pleaded the authority of the state legislature for the erection of the bridge. The court held that the work was not done in conformity with the requirements of the state law; but whether it were or not, it lacked the assent of Congress, which assent the court held was necessary in view of that pro- vision in the act of Congress admitting Oregon as a State, which has been referred to. The court held that this provision of the act was tantamount to a declaration that the navigation of the Willamette River should not be obstructed or interfered with; and that any such obstruction or interference, without

the consent of Congress, whether by state sanction or not, was a violation of the act of Congress; and that the obstruction complained of was in violation of said act. And this is the principal and important question in this case, namely, whether the erection of a bridge over the Willamette River at Portland was a violation of said act of Congress. If it was not, if it could not be, if the act did not apply to obstructions of this kind, then the case did not arise under the constitution or laws of the United States, unless under some other law referred to in the bill.

The power of Congress to pass laws for the regulation of the navigation of public rivers, and to prevent any and all obstructions therein, is not questioned. But until it does pass some such law, there is no common law of the United States which prohibits obstructions and nuisances in navigable rivers, unless it be the maritime law, administered by the courts of admiralty and maritime jurisdiction. No precedent, however, exists for the enforcement of any such law; and if such law could be enforced, (a point which we do not undertake to decide,) it would not avail to sustain the bill in equity filed in the original case. There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the States. Such obstructions and nuisances are offences against the laws of the States within which the navigable waters lie, and may be indicted or prohibited as such; but they are not offences against United States laws which do not exist; and none such exist except what are to be found on the statute book. Of course, where the litigant parties are citizens of different States, the circuit courts of the United States may take jurisdiction on that ground, but on no other. This is the result of so many cases, and expressions of opinion by this court, that it is almost superfluous to cite authorities on the subject. We refer to the following by way of illustration: *Willson* v. *Black Bird Creek Co.*, 2 Pet. 245; *Pollard's Lessee* v. *Hagan*, 3 How. 212, 229; *Passaic Bridges*, 3 Wall. 782 App.; *Gilman* v. *Philadelphia*, 3 Wall. 713, 724; *Pound* v. *Turck*,

95 U. S. 459; *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Cardwell* v. *American Bridge Company,* 113 U. S. 205; *Hamilton* v. *Vicksburg &c. Railroad Co.,* 119 U. S. 280; *Huse* v. *Glover,* 119 U. S. 543; *Sands* v. *Manistee River Imp. Co.,* 123 U. S. 288; *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 700. The usual case, of course, is that in which the acts complained of are clearly supported by a state statute; but that really makes no difference. Whether they are conformable, or not conformable, to the state law relied on, is a state question, not a federal one. The failure of state functionaries to prosecute for breaches of the state law, does not confer power upon United States functionaries to prosecute under a United States law, when there is no such law in existence. But, as we have stated, the court below held that the act of Congress of 1859 was a law which prohibited any obstructions or impediments to the navigation of the public rivers of Oregon, including that of the Willamette River. Was it such an act? Did it have such an effect?

The clause in question had its origin in the 4th article of the compact contained in the Ordinance of the Old Congress for the government of the Territory North West of the Ohio, adopted July 13th, 1787; in which it was amongst other things declared that " the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other States that may be admitted into the confederacy, without any tax, impost, or duty therefor." 1 Stat. 52 *n.* This court has held, that when any new State was admitted into the Union from the North West Territory, the Ordinance in question ceased to have any operative force in limiting its powers of legislation as compared with those possessed by the original States. On the admission of any such new State, it at once became entitled to and possessed all the rights of dominion and sovereignty which belonged to them. See the cases of *Pollard's Lessee* v. *Hagan, supra; Permoli* v. *First Municipality,* 3 How. 589; *Escanaba Co.* v. *Chicago; Cardwell* v. *American Bridge Co.; Huse* v. *Glover; qua supra.* In admitting some of the new States,

however, the clause in question has been inserted in the law, as it was in the case of Oregon, whether the State was carved out of the Territory North West of the Ohio, or not; and it has been supposed that in this new form of enactment, it might be regarded as a regulation of commerce, which Congress has the right to impose. *Pollard's Lessee* v. *Hagan*, 3 How. 212, 230. Conceding this to be the correct view; the question then arises, what is its fair construction? What regulation of commerce does it effect? Does it prohibit physical obstructions and impediments to the navigation of the streams? Or does it prohibit only the imposition of duties for the use of the navigation, and any discrimination denying to citizens of other States the equal right to such use? This question has been before this court, and has been decided in favor of the latter construction.

It is obvious that if the clause in question does prohibit physical obstructions and impediments in navigable waters, the state legislature itself, in a State where the clause is in force, would not have the power to cause or authorize such obstructions to be made without the consent of Congress. But it is well settled that the legislatures of such States do have the same power to authorize the erection of bridges, dams, etc., in and upon the navigable waters wholly within their limits, as have the original States, in reference to which no such clause exists. It was so held in *Pound* v. *Turck*, 95 U. S. 459, in reference to a dam in the Chippewa River in Wisconsin; in *Cardwell* v. *American Bridge Company*, 113 U. S. 205, in reference to a bridge without a draw, erected on the American River in California, which prevented steamboats from going above it; and in *Hamilton* v. *Vicksburg &c. Railroad Co.*, 119 U. S. 280, relating to railroad bridges in Louisiana; in all which cases the clause in question was in force in the States where they arose, and in none of them was said clause held to restrain in any degree the full power of the State to make, or cause to be made, the erections referred to, which must have been more or less obstructions and impediments to the navigation of the streams on which they were placed. In *Cardwell* v. *American Bridge Co.*, the two alter-

nate constructions of the clause above suggested, were brought to the attention of the court, and, on consideration, it was held as follows : " Upon the mature and careful consideration which we have given in this case to the language of the clause in the act admitting California, we are of opinion that, if we treat the clause as divisible into two provisions, they must be construed together as having but one object, namely, to insure a highway equally open to all without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of any toll for their navigation ; and that the clause contemplated no other restriction upon the power of the State in authorizing the construction of bridges over them whenever such construction would promote the convenience of the public." In *Hamilton* v. *Vicksburg &c. Railroad Co.* it was said: " Until Congress intervenes in such cases, and exercises its authority, the power of the State is plenary. When the State provides for the form and character of the structure, its directions will control, except as against the action of Congress, whether the bridge be with or without draws, and irrespective of its effect upon navigation ; " and in the same case the construction given to the clause in question in *Cardwell* v. *American Bridge Company* was reiterated, namely, that it was intended to prevent any discrimination against citizens of other States in the use of navigable streams, and any tax or toll for their use. In *Huse* v. *Glover*, 119 U. S. 543, where a portion of the Illinois River had been improved by the State of Illinois, by the erection of locks in the river, and a toll was charged for passing through the same, it was held that this was no encroachment upon the power of Congress to regulate commerce, and that whilst the ordinance of 1787 was no longer in force in Illinois, yet, if it were, the construction given to the clause in the Cardwell case was approved, and the following observation was made: " As thus construed the clause would prevent any exclusive use of the navigable waters of the State — a possible farming out of the privilege of navigating them to particular individuals, classes, or corporations, or by vessels of a particular char-

acter." It was also held that the exaction of tolls for passage through the locks as a compensation for the use of the artificial facilities constructed, was not an impost upon the navigation of the stream. The same views are held in the recent case of *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288.

It seems clear, therefore, that according to the construction given by this court to the clause in the act of Congress relied upon by the court below, it does not refer to physical obstructions, — but to political regulations which would hamper the freedom of commerce. It is to be remembered that in its original form, the clause embraced carrying places between the rivers, as well as the rivers themselves; and it cannot be supposed that those carrying places were intended to be always kept up as such. No doubt that at the present time some of them are covered by populous towns, or occupied in some other way incompatible with their original use; and such a diversion of their use, in the progress of society, cannot but have been contemplated. What the people of the old States wished to secure was, the free use of the streams and carrying places in the North West Territory, as fully as it might be enjoyed by the inhabitants of that territory themselves, without any impost or discriminating burden. The clause in question cannot be regarded as establishing the police power of the United States over the rivers of Oregon, or as giving to the federal courts the right to hear and determine, according to federal law, every complaint that may be made of an impediment in, or an encroachment upon, the navigation of those rivers. We do not doubt that Congress, if it saw fit, could thus assume the care of said streams, in the interest of foreign and interstate commerce; we only say that, in our opinion, it has not done so by the clause in question. And although, until Congress acts the States have the plenary power supposed, yet, when Congress chooses to act, it is not concluded by anything that the States, or that individuals by its authority or acquiescence, have done, from assuming entire control of the matter, and abating any erections that may have been made, and preventing any others from being made, except in

conformity with such regulations as it may impose.    It is for this reason, namely, the ultimate (though yet unexerted) power of Congress over the whole subject matter, that the consent of Congress is so frequently asked to the erection of bridges over navigable streams.    It might itself give original authority for the erection of such bridges when called for by the demands of interstate commerce by land; but, in many, perhaps the majority of cases, its assent only is asked, and the primary authority is sought at the hands of the State.    With regard to this very river, the Willamette, three acts of Congress have been passed in relation to the construction of bridges thereon, to wit: one, approved February 2d, 1870, which gave consent to the corporation of the city of Portland to erect a bridge from Portland to the east bank of the river, not obstructing, impairing or injuriously modifying its navigation, and first submitting the plans to the Secretary of War; another, approved on the 22d of June, 1874, which authorized the county commissioners of Marion County, or said commissioners jointly with those of Polk County, to build a bridge across said river at Salem; a third act, approved June 23d, 1874, which authorized the Oregon and California Railroad Company, alone, or jointly with the Oregon Central Railroad Company, to build a railroad bridge across said river at the city of Portland, with a draw of not less than 100 feet in the clear on each side of the draw abutment, and so constructed as not to impede the navigation of the river, and allow the free passage of vessels through the bridge.    These acts are special in their character, and do not involve the assumption by Congress of general police power over the river.

The argument of the appellees, that Congress must be deemed to have assumed police power over the Willamette River in consequence of having expended money in improving its navigation, and of having made Portland a port of entry, is not well founded.    Such acts are not sufficient to establish the police power of the United States over the navigable streams to which they relate.    Of course, any interference with the operations, constructions or improvements made by the general government, or any violation of a port law

enacted by Congress, would be an offence against the laws and authority of the United States; and an action or suit brought in consequence thereof would be one arising under the laws of the United States. But no such violation or interference is shown by the allegations of the bill in the original suit in this case, which simply states the fact that improvements have been made in the river by the government, without stating where, and that Portland had been created a port of entry. In the case of *Escanaba Co.* v. *Chicago*, it was said: "As to the appropriations made by Congress, no money has been expended on the improvement of the Chicago River above the first bridge from the lake, known as Rush Street Bridge. No bridge, therefore, interferes with the navigation of any portion of the river which has been thus improved. But, if it were otherwise, it is not perceived how the improvement of the navigability of the stream can affect the ordinary means of crossing it by ferries and bridges." 107 U. S. 690. In the present case there is no allegation, if such an allegation would be material, that any improvements in the navigation of the Willamette River have been made by the government at any point above the site of the proposed bridge.

As to the making of Portland a port of entry, the observations of Mr. Justice Grier in *The Passaic Bridge Cases*, 3 Wall. 782, 793, App., are very apposite. Those cases were decided in September, 1857, by dismissing the bills which were filed for injunctions against the erection of a railroad bridge across the Passaic River at Newark, New Jersey, and a plank-road bridge across the same river below Newark. The decrees were affirmed here by an equally divided court in December Term, 1861. It being urged, amongst other things, that Newark was a port of entry, and that the erection of these bridges, though under the authority of the state legislature, was in conflict with the act of Congress establishing the port, Mr. Justice Grier said: "Congress by conferring the privilege of a port of entry upon a town or city does not come in conflict with the police power of a State exercised in bridging her own rivers below such port. If the power to make a town a port of entry includes the right to regulate the means

by which its commerce is carried on, why does it not extend to its turnpikes, railroads, and canals, — to land as well as water? Assuming the right (which I neither affirm nor deny) of Congress to regulate bridges over navigable rivers belew ports of entry, yet not having done so, the courts cannot assume to themselves such a power. There is no act of Congress or rule of law which courts could apply to such a case." p. 793. These views were adhered to by the same judge in the subsequent case of *Gilman* v. *Philadelphia*. The bridge which was the subject of controversy in that case was within the limits of the port of Philadelphia, which, by the act of 1799, included the city of Philadelphia, and by that of 1834, was extended northerly to Gunner's Run. See 3 Wall. 713, 718. That case arose soon after *The Passaic Bridge Cases*, and, so far as interference with navigation was concerned, was identical in character with them; and Mr. Justice Grier, upon the same grounds taken and asserted by him in those cases, dismissed the bill. The decree was affirmed in this court in December Term, 1865, by a vote of seven justices to three, Justices Clifford, Wayne, and Davis dissenting. So that Justice Grier's views were finally affirmed by a decided majority of the court.

It is urged that in *The Wheeling Bridge Case*, 13 How. 518, this court decided the bridge there complained of to be a nuisance, and decreed its prostration, or such increased elevation as to permit the tall chimneys of the Pittsburg steamers to pass under it at high water. But in that case this court had original jurisdiction in consequence of a State being a party; and the complainant (the State of Pennsylvania) was entitled to invoke, and the court had power to apply, any law applicable to the case, whether state law, federal law, or international law. The bridge had been authorized by the legislature of Virginia, whose jurisdiction extended across the whole river Ohio. But Virginia, in consenting to the erection of Kentucky into a State, had entered into a compact with regard to the free navigation of the Ohio,[1] confirmed by the act of Con-

---

[1] See Mr. Stanton's argument, 3 How. 523; 1 Bioren's Laws, U. S. p. 675, art. *seventh.*

gress admitting Kentucky into the Union, which the court held to be violated by authorizing the bridge to be constructed in the manner it was; and the bridge, so constructed, injuriously affected a supra-riparian State (Pennsylvania) bordering on the river, contrary to international law. Mr. Justice Grier, in *The Passaic Bridge Cases*, disposes of *The Wheeling Bridge Case* as follows: "This legislation of Virginia being pleaded as a bar to further action of the court in the case, necessarily raised these questions: Could Virginia license or authorize a nuisance on a public river, flowing, which rose in Pennsylvania, and passed along the border of Virginia, and which, by compact between the States, was declared to be 'free and common to all the citizens of the United States'? If Virginia could authorize any obstruction at all to the channel navigation, she could stop it altogether, and divert the whole commerce of that great river from the State of Pennsylvania, and compel it to seek its outlet by the railroads and other public improvements of Virginia. If she had the sovereign right over this boundary river claimed by her, there would be no measure to her power. She would have the same right to stop its navigation altogether as to stop it ten days in a year. If the plea was admitted, Virginia could make Wheeling the head of navigation on the Ohio, and Kentucky might do the same at Louisville, having the same right over the whole river which Virginia can claim. This plea, therefore, presented not only a great question of international law, but whether rights secured to the people of the United States by compact made before the Constitution, were held at the mercy or caprice of every or any of the States to which the river was a boundary. The decision of the court denied this right." The plea being insufficient as a defence, of course the complainant was entitled to a decree prostrating the bridge, which had been erected *pendente lite*. But to mitigate the apparent hardship of such a decree, if executed unconditionally, the court, in the exercise of a merciful discretion, granted a stay of execution on condition that the bridge should be raised to a certain height, or have a draw put in it which would permit boats to pass at all stages of the navigation. From this mod-

ification of the decree no inference can be drawn that the courts of the United States claim authority to regulate bridges below ports of entry, and treat all state legislation in such cases as unconstitutional and void.   It is evident, from this statement," continues Justice Grier, "that the Supreme Court, in denying the right of Virginia to exercise this absolute control over the Ohio River, and in deciding that, as a riparian proprietor, she was not entitled, either by the compact or by constitutional law, to obstruct the commerce of a supra-riparian State, had before them questions not involved in these cases," [the Passaic bridges,] "and which cannot affect their decision.  The Passaic River, though navigable for a few miles within the State of New Jersey, and therefore a public river, belongs wholly to that State.  It is no highway to other States; no commerce passes thereon from States below the bridge to States above."   3 Wall. 792.

This exposition of *The Wheeling Bridge Case,* by one who had taken a decided part in its discussion and determination, effectually disposes of it as a precedent for the jurisdiction of the Circuit Courts of the United States in matters pertaining to bridges erected over navigable rivers, at least those erected over rivers whose course is wholly within a single State.   The Willamette River is one of that description.

On the whole, our opinion is, that the original suit in this case was not a suit arising under any law of the United States; and since, on such ground alone, the court below could have had jurisdiction of it, it follows that the decree on the bill of review must be

*Reversed, and the record remanded with instructions. to reverse the decree in the original suit, and to dismiss the bill filed therein, without prejudice to any other proceeding which may be taken in relation to the erection of said bridge, not inconsistent with this opinion.*