HART AND MILLER ISLANDS AREA ENVIRONMENTAL GROUP, INC., a Maryland Corporation; Honorable Clarence Long, M.C.; Honorable Norman R. Stone; Maryland Wildlife Federation, Inc., a Maryland Corporation; John Henderson; Howard Sappington; George Wohlleben; Robert Scott; Margaret Caldwell; Charles Justice, Appellees,

v.

The CORPS OF ENGINEERS OF the UNITED STATES ARMY; Honorable Clifford L. Alexander, Secretary of the Army; Lt. General John W. Morris, Chief of Engineers of the United States Army; Col. G. K. Withers, District Engineer, Baltimore District, United States Army Corps of Engineers, Defendants,

and

State of Maryland, Ex Rel., Francis B. Burch, Attorney General, Appellant,

and

Steamship Trade Association of Baltimore, Inc., Intervening Defendant.

HART AND MILLER ISLANDS AREA ENVIRONMENTAL GROUP, INC., a Maryland Corporation; Honorable Clarence Long, M.C.; Honorable Norman R. Stone; Maryland Wildlife Federation, Inc., a Maryland Corporation; John Henderson; Howard Sappington; George Wohlleben; Robert Scott; Margaret Caldwell; Charles Justice, Appellees,

v.

The CORPS OF ENGINEERS OF the UNITED STATES ARMY; Honorable Clifford L. Alexander, Secretary of the Army; Lt. General John W. Morris, Chief of Engineers of the United States Army; Col. G. K. Withers, District Engineer, Baltimore District, United States Army Corps of Engineers, Defendants,

and

State of Maryland, Ex Rel., Francis B. Burch, Attorney General, Intervening Defendant,

and

Steamship Trade Association of Baltimore, Inc., Appellant.

HART AND MILLER ISLANDS AREA ENVIRONMENTAL GROUP, INC., a Maryland Corporation; Honorable Clarence Long, M.C.; Honorable Norman R. Stone; Maryland Wildlife Federation, Inc., a Maryland Corporation; John Henderson; Howard Sappington; George Wohlleben; Robert Scott; Margaret Caldwell; Charles Justice, Appellees,

v.

The CORPS OF ENGINEERS OF the UNITED STATES ARMY; Honorable Clifford L. Alexander, Secretary of the Army; Lt. General John W. Morris, Chief of Engineers of the United States Army; Col. G. K. Withers, District Engineer, Baltimore District, United States Army Corps of Engineers, Appellants,

and

State of Maryland, Ex Rel., Francis B. Burch, Attorney General, Steamship Trade Association of Baltimore, Inc., Intervening Defendant.

Nos. 78–1911, 78–1912 and 79–1037.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1979.

Decided May 28, 1980.

Joshua I. Schwartz, Washington, D. C., Warren K. Rich, Sp. Appointed Atty., Baltimore, Md., for the State of Maryland (Stephen H. Sachs, Atty. Gen., George A. Nilson, Deputy Atty. Gen., Robert B. Harrison, III, Asst. Atty. Gen., William C. Stifler, III, and Paul B. Land, Baltimore, Md., for Steamship Trade Association, on brief) for appellants.

Edward B. Rybczynski and Ralph K. Rothwell, Jr., Baltimore, Md., for appellees.

Before WIDENER and HALL, Circuit Judges, and WARRINER, District Judge.*

WIDENER, Circuit Judge:

The State of Maryland applied to the U. S. Army Corps of Engineers (the Corps), in 1972, for a permit pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, to construct a diked disposal area for dredged material on and adjacent to Hart and Miller Islands in Chesapeake Bay. The purpose of the project is to provide a site for dumping material dredged from the bottom of Baltimore Harbor and its approach channels. This material will include spoil from maintenance dredging and spoil produced by the Baltimore Harbor Channel Project, which is a Corps project designed to increase the depth of Baltimore Harbor.[1]

The Corps held a public hearing on the proposal in August 1972 and completed a

---

* United States District Court for the Eastern District of Virginia, sitting by designation.

1. Congress authorized the Baltimore Harbor Channel Project with the understanding that the State of Maryland would provide a disposal area for the spoil to be produced. Rivers and Harbors Act of 1970, Pub.L. 91–611, § 101, 84 Stat. 1818; H.R.Rep.No. 1665, 91st Cong., 2d Sess. 10 (1970).

draft environmental impact statement in February 1973. Action on the Maryland application was delayed in order to comply with Section 404 of the Federal Water Pollution Control Act of 1972, Pub.L. 92–500, 86 Stat. 816, 884, 33 U.S.C. § 1344. A second public hearing was held in May 1975, see 459 F.Supp. 279, 281–282, and additional written comments were received in response to circulation of the draft environmental impact statement. The Corps issued a final environmental impact statement in February 1976. The Secretary of the Army, in November 1976, acting through the Corps, issued a permit to the State of Maryland, under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Federal Water Pollution Control Act of 1972, authorizing construction of the diked disposal facility.

Two environmental groups and a number of individuals commenced this action against the Corps in June 1977, seeking declaratory and injunctive relief voiding the permit. The complaint alleges that the Corps lacks the authority to issue the permit under Section 10 of the Rivers and Harbors Act because the barrier to surround the fill constitutes a "dike" which requires Congressional approval under Section 9 of that act, 33 U.S.C. § 401. The State of Maryland and the Steamship Trade Association of Baltimore intervened as defendants. All parties filed cross-motions for summary judgment in May 1978. 459 F.Supp. 280.

The district court granted the plaintiffs' motion for summary judgment and denied the motions filed by the defendants. *Hart and Miller Islands Area Environmental Group, Inc. v. Corps of Engineers*, 459 F.Supp. 279 (D.Md.1978). The court held that the Corps could not authorize construction of the disposal facility because it was a dike within the meaning of Section 9 of the Rivers and Harbors Act of 1899 and therefore required Congressional approval.

Section 9 of that statute requires the consent of Congress for the construction of "any bridge, dam, dike, or causeway over or in" any navigable water of the United States.[2] Under Section 10 of the same act the authorization of the Secretary of the Army is sufficient for the construction of "any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures."[3] The sole issue decided in this ap-

---

2. Section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401, now reads:

   It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided*, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: *And provided further*, That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and

   received the approval of the Chief of Engineers and of the Secretary of the Army.

3. Section 10 of the Rivers and Harbors Act of 1899 is now 33 U.S.C. § 403:

   The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

peal is whether the Hart and Miller Islands diked disposal area is subject to Section 9 or Section 10 of the Rivers and Harbors Act. We hold that the structure is not a dike within the meaning of Section 9 and is governed by Section 10 of the statute. Therefore, it does not require Congressional approval. We thus approve the issuance of the permit by the Corps and reverse the district court.

Baltimore Harbor and its nearby navigation channels have been dredged many times in the past. Dredging will continue, both to maintain existing channels and to increase the depth of the harbor and channels.[4] An estimated 100 million cubic yards of bottom sediment will be dredged from Baltimore Harbor and nearby channels in the next twenty years. Historically, the dredged material has been dumped in the open waters of Chesapeake Bay. Such open water dumping causes pollution in the vicinity of the disposal site since the dredged bottom sediment contains toxic chemicals, heavy metals, oil, grease, and other substances. The spoil material deposited by open water dumping, of course, may also damage bottom dwelling fauna.[5] The disposal area is designed to improve the water quality of Upper Chesapeake Bay by the elimination of open water dumping.

Hart and Miller Islands are privately owned, contain no permanent structures, and are used by a limited number of boaters for recreation (without the owner's permission). There are beaches and wetlands on both islands, and part of Hart Island is forested. Both islands have a serious erosion problem which has decreased the area of Hart Island from 150 acres in 1933 to 120 acres in 1967, and decreased the area of Miller Island from 50 acres in 1933 to 33

acres in 1967. The maximum elevation of either island is 5.5 feet.

The disposal area will be 1,100 acres, approximately 12,430 feet by 4,700 feet, and will contain 52 million cubic yards of sediment when filled to its capacity of 18 feet above mean low water. About 52 percent of Miller Island (18.4 acres) and 11.5 percent of Hart Island (10.9 acres) will be covered by the facility. The dike will be constructed from sand deposits adjacent to and underlying the enclosure, and the face toward the bay will be riprapped with stone. Three sluice gates will be provided to prevent overtopping and washout of the dike. The islands are approximately one mile from the nearest point on the mainland, the western side of the bay. The containment area will be located on the eastern or bay side of the islands. The dike will extend from Hart and Miller Islands no more than 4,700 feet into the Bay in an area where the Bay is about 7 miles wide. Essentially the area is made by connecting Hart and Miller Islands with a wall, and, using the islands as two corners, then extending other walls into the Bay at right angles to the connecting wall between the islands, the ends of the walls extended into the Bay then being connected by another wall.

The dredged material will be retained in the disposal area for months or years. Sediment will settle and water will slowly percolate through the bottom of the dike until a water-level equilibrium is reached. All particulate matter will be retained in the containment area. While the Harbor spoil can be expected to contain substances that exert a biochemical oxygen demand, the slow filtration through the dike walls will eliminate the oxygen demand before the filtrate reaches the Bay. Sedimentation

4. In 1970, Congress authorized funds for the Baltimore Harbor Channel project, which will deepen the Harbor and its approach channels to a depth of fifty feet. The present depth is from thirty-nine to forty-two feet. Rivers and Harbors Act of 1970, Pub.L. 91–611, § 101, 84 Stat. 1818.

5. Open-water dumping has been the subject of continuous criticism. As a consequence, the State tells us without contradiction that in 1969

the Maryland legislature authorized the expenditure of $13,000,000 for the design and construction of one or more containment areas to act as a receptacle for spoil dredged from Baltimore Harbor and the approach channels. Recognizing the deleterious environmental effects of open water dumping, in 1975 Maryland prohibited the discharge of spoil from Baltimore Harbor unless it was deposited in containment facilities. Md. Natural Resources Code, Sec. 8–1602.

and filtration, coupled with the long retention period, will effectively remove and destroy any pathogenic bacteria that might be present in the Harbor mud.

The Army Corps of Engineers processed the permit application under Section 10 of the Rivers and Harbors Act. Since the adoption of that statute, the Corps has consistently interpreted Section 9 as requiring Congressional approval only for structures which completely span a navigable waterway. Under Section 10, the Corps has administratively authorized structures which do not extend entirely across a waterway, no matter how large and whether or not called dikes. See *infra* at 1289. The Corps argues that the statute is ambiguous and therefore the paucity of case law emphasizes the significance of the relevant legislative history and administrative practice and interpretation. The Supreme Court has held in a case involving this very statute that we should look to the administrative construction thereof, and has also held at least Section 10 is ambiguous and probably Section 9 as well. In *Wisconsin v. Illinois*, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929), the Court upheld the validity of a Section 10 permit authorizing diversion of water from Lake Michigan, rejecting the argument that the diversion required Congressional approval because it constituted an obstruction to navigation. After briefly describing the legislative history of the Rivers and Harbors Act of 1899, the Court stated:

> Congress, having stated in Section 9 as to what particular structures its specific consent should be required, intended to leave to the Secretary of War, acting on the recommendation of the Chief of Engineers, the determination of what should be approved and authorized in the classes of cases described in the second and third clauses of Section 10. If the section were construed to require a special authorization by Congress whenever in any aspect it might be considered that there was an obstruction to navigable capacity, none of the undertakings specifically provided for in the second and third clauses of Section 10 could safely be undertaken without a special authorization of Congress. We do not think this was intended. . . .

> The true intent of the Act of Congress was that unreasonable obstructions to navigation and navigable capacity were to be prohibited, and in the cases described in the second and third clauses of Section 10, the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine what in the particular cases constituted an unreasonable obstruction.

> This construction of Section 10 is sustained by the uniform practice of the War Department for nearly thirty years. Nothing is more convincing in interpretation of a doubtful or ambiguous statute.

> . . .

> The practice is shown by the opinion of the Acting Attorney General, transmitted to the Secretary of War, 34 Op.Attys.Gen. 410, 416. The Secretary of War acted on this view on May 8, 1899, about two months after the passage of the Act. . . The fact that the Secretary of War acted on this view was made known to Congress by many reports.

278 U.S. 367, 412–414, 49 S.Ct. at 170 (Citations omitted).

Very few cases have dealt with Section 9 and the meaning of the word dike. *Citizens Committee for the Hudson Valley v. Volpe*, 302 F.Supp. 1083 (S.D.N.Y.1969), aff'd 425 F.2d 97 (2d Cir. 1970), cert. denied (sub nom *Parker v. Citizens Comm. for Hudson Valley*), 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970), involved a permit to construct an expressway along the east bank of the Hudson River. The construction protruded into the river. The district court held that Congressional consent was necessary for construction of a rock dike parallel to the shore of the river, designed to contain fill and thus create new land to support the highway. Relying on dictionaries, the court applied the ordinary meaning to the term dike as used in Section 9. 302 F.Supp. at 1088–89. The Court of Appeals affirmed in an opinion primarily concerned with questions of standing and jurisdiction, which only "briefly" addressed the merits. 425

F.2d 97, 106. The Corps and the State argue that the record before the court in *Hudson Valley* was deficient because it did not contain the full legislative and administrative history materials presented to the court below in this case.

In *Petterson v. Resor,* 331 F.Supp. 1302 (D.Or.1971), remanded as moot, 494 F.2d 124 (9th Cir. 1974), the court did have the benefit of legislative and administrative history materials, and adopted a more limited interpretation of Section 9. The project at issue involved depositing fill, surrounded by a retention structure, in the South Slough of the Columbia River in order to support an airport runway extension. The district court determined that the project did not involve dikes (within the meaning of Section 9) because Congressional consent was required only "for those structures like bridges, dams and dikes, usually larger structures, which are placed across a river and which constitute an obstruction to navigation." 331 F.Supp. 1302, 1306. The court held that the runway extension did not obstruct navigation and thus Congressional approval was not required. The case became moot because the Port of Portland formally withdrew its plan to enlarge the airport, and as a result the Corps of Engineers canceled the permit. *Citizens Com-*

*mittee for the Columbia River v. Callaway,* 494 F.2d 124, 125 (9th Cir. 1974).

A 42 mile canal was at issue in *Sierra Club v. Morton,* 400 F.Supp. 610 (N.D.Calif. 1975). Because the structure, labeled a canal, would cross and completely dam and obstruct a navigable river, the court determined that it was a "dam" or "dike" within the meaning of Section 9. 400 F.Supp. 610, 626–27.

The challenged project in *Citizens Committee for Environmental Protection v. United States Coast Guard,* 456 F.Supp. 101 (D.N.J.1978), involved placement of fill behind retaining walls in the Raritan River, in order to support a highway extension. Rejecting the plaintiffs' argument that the fill constituted a dam or dike, the court determined that the critical question was whether the activity constituted an unreasonable obstruction to navigation. Since the impact of the project on actual navigation was negligible, the court held the Corps was justified in determining that Section 9 did not apply, 456 F.Supp. 101, 113–14, and that a Section 10 permit was sufficient.[6]

Plaintiffs claim that the language contained in the Rivers and Harbors Act is clear, and that its plain meaning should control without reference to legislative history or administrative practice. The few

---

**6.** Other courts, without addressing the issue, have applied Section 10 to dikes that do not span a waterway. In *United States v. Bailey,* 467 F.Supp. 925 (E.D.Ark.1979), the Corps had issued a permit, pursuant to Section 10, for the construction of a dike extending into but not across the Arkansas River. The court held that the Government was estopped from asserting that the dike was constructed in violation of a restriction embodied in the Corps' permit.

In *United States v. Cameron,* 466 F.Supp. 1099 (M.D.Fla.1978), it is apparent that both the court and the parties would have applied Section 10 to a dike but for the fact that the dike was located above the ordinary high water mark.

*Magno v. Corros,* 439 F.Supp. 592 (D.S.C. 1977), was a wrongful death action arising out of the collision of a boat with a rock dike protruding 1,100 feet into a river. The court noted that the United States had clear authority to construct the dike, citing Section 10. 439 F.Supp. at 599.

One other court would have applied Section 9 to a dike that did span a waterway. *Environ-*

*mental Defense Fund v. Alexander,* 467 F.Supp. 885 (N.D.Miss.1979), was a challenge to construction of the Tennessee-Tombigbee Waterway which Congress authorized in 1946. A quarter of a century later, the Corps authorized modifications in the still uncompleted project to add dams, dikes, and causeways. The court held that construction of "dikes or causeways across the Tibbee and Tombigbee River," without specific Congressional approval, would violate Section 9 but for the fact that the structures were temporary and, upon completion of the project, would be covered by thirteen feet of water. 467 F.Supp. at 911. The court relied on *Sierra Club* and *Hudson Valley,* but, since the structures extend across the river, the holding is consistent with *Petterson.*

The court also held that a project modification to replace levees along the side of the waterway with five dams across the canal section of the waterway was within the Corps' discretion and did not constitute a violation of Section 9 although the damming structures extended across the waterway.

decided cases do not support this argument. Plaintiffs in *Petterson v. Resor* relied on *Hudson Valley*, but the *Petterson* court refused to do so. In *Sierra Club v. Morton*, the court professed to follow *Hudson Valley*, but its holding is consistent with *Petterson*. *Citizens Committee for Environmental Protection* declined to follow either *Hudson Valley* or *Sierra Club* and instead applied the test of *Petterson*. If the language we have quoted from *Wisconsin v. Illinois* is not sufficient, these conflicting interpretations of Section 9 demonstrate that the language is not clear and has no plain meaning apparent to the courts.

As the nation grew and expanded in the nineteenth century, State legislatures authorized construction of dams and bridges that blocked waterborne commerce on navigable rivers. Challenges to these actions resulted in Supreme Court holdings that, in the absence of federal legislation to the contrary, the States had the power to authorize construction of bridges, dams, or other structures even if they obstructed navigation.[7] Congress responded by providing for affirmative federal regulation of obstructions to navigation in order to control the proliferation of bridges which obstructed commercial river navigation. 21

Cong.Rec. 8602–05, 8607, 8684, 9813 (1890); see 40 Cong.Rec. 1717 (1906). Section 7 of the Rivers and Harbors Act of 1890, 26 Stat. 453, 454, in general terms, prohibited the construction of all obstructions to navigation unless approved by the Secretary of War.[8] The first clause of that section prohibited building any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty, or other structure, not within established harbor lines, so as to obstruct or impair navigation, without the permission of the Secretary of War. The second clause prohibited the construction of any bridge, bridge-draw, bridge piers and abutments, causeway, or other works, over or in any navigable waters, under any act of the legislative assembly of any State, unless approved by the Secretary of War.

Congress, in 1896, directed the Secretary of War to prepare a compilation of existing laws relating to the protection of navigable waters, along with suggestions for a revision. Rivers and Harbors Act of 1896, Section 2, 29 Stat. 202, 234. The Corps of Engineers submitted the draft revision along with the compilation in 1897. After the Rivers and Harbors Bill of 1899 had been passed by the House (H.R. 11795; 32 Cong.Rec. 1408 (1899)), the Corps' draft was

---

**7.** The Supreme Court rejected claims that the common law of the United States prohibits obstructions in our navigable waters, *Willamette Iron Bridge Co. v. Hatch*, 125 U.S. 1, 8, 8 S.Ct. 811, 814, 31 L.Ed. 629 (1888), and that language in State enabling acts declaring that navigable waters must remain "forever free" was an expression of Congressional intent to prohibit State authorized obstructions. *Id.* at 12, 8 S.Ct. at 817; *Cardwell v. American River Bridge Co.*, 113 U.S. 205, 5 S.Ct. 423, 28 L.Ed. 959 (1885).

**8.** Section 7 of the Rivers and Harbors Act of 1890, 26 Stat. 454:

That it shall not be lawful to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty, or structure of any kind outside established harbor-lines, or in any navigable waters of the United States where no harbor-lines are or may be established, without the permission of the Secretary of War, *in* any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce, or anchorage of said waters, and it shall not be lawful hereafter to commence the construc-

tion of any bridge, bridge-draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river, or navigable waters of the United States, under any act of the legislative assembly of any State, until the location and plan of such bridge or other works have been submitted to and approved by the Secretary of War, or to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of the channel of said navigable water of the United States, unless approved and authorized by the Secretary of War: *Provided*, That this section shall not apply to any bridge, bridge-draw, bridge piers and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, draw bridge, bridge piers and abutments, or other works, under an act of the legislature of any State, over or in any stream, port, roadstead, haven or harbor, or other navigable water not wholly within the limits of such state.

introduced in the Senate as an amendment to the bill with the representation that it, except amendments, was in accord with existing statutes. 32 Cong.Rec. 2296–2297 (1899). The Senate passed the bill, as amended, the same day. 32 Cong.Rec. 2302. The Conference Committee accepted the amendments and renumbered the relevant portions as Sections 9 and 10. The House Conferees presented the final bill to the House with the following statement:

> The bill as now agreed upon and presented also includes a codification of existing laws pertaining to rivers and harbors, though containing no essential changes in the existing law. 32 Cong.Rec. 2923.

Both houses accepted the Conference Report, and the bill, as drafted by the Corps, became law. 32 Cong.Rec. 2843, 2925, 2934 (1899). Thus, the Corps' draft became Sections 9 and 10 of the Rivers and Harbors Act of 1899. Congress passed the Act, without carefully examining its provisions, on the strength of representations that the Act made no significant change in existing law. As the Supreme Court put it, "Sections 9 and 10 [of the 1899 Act] were the rearranged result of the provisions of Sections 7 and 10 of the Act of 1890." [9] *Wisconsin v. Illinois*, 278 U.S. 367, 412, 49 S.Ct. 163, 169, 73 L.Ed. 426 (1929). It is entirely proper to interpret the ambiguous 1899 Act in light of its predecessor statutory provisions.

As stated, the issue in the present case is whether the Hart and Miller Islands disposal area is governed by the second clause of Section 10 or the first clause of Section 9 of the 1899 Act. The second clause of present Section 10 (33 U.S.C. § 403) derives from the first clause of Section 7 of the 1890 Act. The only significant change is that dam is not among the structures listed in the present Section 10. The first clause of Section 9 (33 U.S.C. § 401) derives from the

second clause of Section 7 of the 1890 Act, which referred to works authorized by State legislatures.

A comparison of the 1890 and 1899 statutes, however, reveals there was in fact a change from 1890, when all authority was delegated to the Secretary of War, to 1899, when a part was reserved to Congress. Remembering the representations in Congress of no substantial change, that change is understood in light of *United States v. Keokuk & H. Bridge Co.*, 45 F. 178 (S.D.Iowa 1891) and *United States v. Rider*, 50 F. 406 (S.D.Ohio 1892). Both cases dealt with Congressional delegation, to the Secretary of War, of the power to compel alteration of bridges that obstruct navigation, parts of the Rivers and Harbors Acts. In broad dictum, the first case indicated it would be an unauthorized delegation of power by Congress to "confer upon the secretary of war the power to determine when and where bridges should be built over the navigable rivers of the country," 45 F. 178, 183, and held invalid the delegation of power to the Secretary of War to declare lawfully constructed bridges to be obstructions to navigation. The second case, construing the Rivers and Harbors Act of 1890, relied upon the first and held that the statute impermissibly delegated legislative power. 50 F. 406, 410. These cases thus limited Congressional power to delegate authority over two structures that completely spanned navigable rivers. Neither case dealt with obstructions that did not span navigable waters. Section 9 of the 1899 Act differs from its predecessor because it requires Congressional approval, and it adds dams and dikes to the list of structures affected. The legislative history of the Act together with the then prevailing precedents, *Keokuk* and *Rider*, indicate that Section 9 may well have been intended to re-

---

9. A close examination of Sections 9 and 10 and their predecessor provisions resolves any apparent inconsistency between the Supreme Court's statement that Sections 9 and 10 of the 1899 Act are derived from Sections 7 and 10 of the 1890 Act, and our taking clauses 1 and 2 of Section 7 of the 1890 Act as the relevant predecessor provisions. Both of the clauses at issue here (Section 9, clause 1 and Section 10, clause 2, of the 1899 Act) are derived from Section 7 of the 1890 Act. Clause 1 of Section 10 of the 1899 Act, which prohibits "the creation of any obstruction" to navigable waters without authorization, and which is not at issue here, is derived from the first sentence of Section 10 of the 1890 Act. *Compare* 30 Stat. 1151, 33 U.S.C. §§ 401, 403, *with* 26 Stat. 453, 454 and 27 Stat. 110.

quire Congressional approval only where agency approval would have been an unconstitutional delegation of legislative power, i. e. for bridges, causeway, dikes, or dams that completely span navigable waterways. In all events, this is a perfectly reasonable construction of the statute, and it has been so construed by the Corps since its passage. Taking the view of the structures listed in Section 9 of the 1899 Act, two are works which, by definition, span waterways (bridges and dams). Dikes as used in that section, according to this construction, should be interpreted to include only dikes that span waterways.

The Corps of Engineers, the agency that wrote the statute and is charged with its execution, has interpreted Section 9 as applying only "to that class of structures such as bridges and dams which extend entirely across a waterway." Lecture of Judge G. W. Koonce, O.C.E. to Company Officer's Class, Engineer School Fort Humphrey's, Virginia, April 23, 1926, as reproduced in Hearings on Water Pollution Control Legislation—1971 (Oversight of Existing Programs) Before the House Committee on Public Works, 92nd Cong., 1st Sess., Ser. 92–10, 284–291, at 288 (1971). Section 10, according to the Corps, "relates to the construction of works in the nature of wharves, piers, jetties, and the like, which project into, rather than cross, the bodies of water in which they are located." *Id.* at 289. The Secretary of War, in testimony before the House Commerce Committee in 1916, stated that Section 10 gives his department "the authority to permit or refuse to permit any obstruction, except the class which extend clear across a stream, however large and important, in any navigable water of the United States." Hearings on General Dam Legislation Before the House Committee on Interstate and Foreign Commerce, 64th Cong., 1st Sess., at 18 (1916). The then Chief of the Miscellaneous Civil Branch of the Corps of Engineers, James E. DeSista, summarized the Corps' interpretation and practice in an affidavit originally prepared for the *Petterson* case which was also before the court below.

It has been my interpretation, and that followed by my predecessors in office, that the terms "dike" and "causeway" as used in Section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. 401, refer to a structure which results in the closure of a navigable waterway by extending completely across same so as to block navigation if no provision is made for its passage. The building of a bulkhead, retaining wall, or revetment behind which solid fill is placed in navigable waters for use as a retaining structure has been administratively interpreted to constitute a class of structures which can be authorized by the Secretary of the Army under Section 10 of the Act, 33 U.S.C. 403, notwithstanding that such bulkheads, retaining walls, or revetments are frequently referred to in the vernacular as dikes or causeways.

Affidavit of James E. DeSista, August 6, 1970.

The DeSista affidavit lists 20 "significant solid fill retaining structures" that have been authorized under Section 10, dating from 1920 to 1969. *Id.* The affidavit of John P. O'Hagan, Chief of the Operations Division of the Baltimore District of the Corps, submitted to the court below, confirms the DeSista affidavit and also lists 25 diked disposal areas authorized by the Baltimore District alone during fiscal years 1972 through 1977.[10] Affidavit of John P. O'Hagan, May 18, 1978. The Corps' regulations implementing Section 9 of the 1899 Act, as amended in 1977, define a dike as

an embankment, low dividing wall or other protective structure that completely spans a navigable waterway of the United States and that may obstruct interstate waterborne commerce.

33 C.F.R. 321.2(c), 42 Fed.Reg. 37139. While prior regulations contained no such explicit definition of dike, published regulations giving effect to the Corps' interpretation are found in the Code of Federal Regulations since its inception. See, e. g., 33 C.F.R. 209.120 (1948); 33 C.F.R. 209.-120(b)(1)(a) (1969); 33 C.F.R. 209.120 (1974).

10. In 1972 Congress amended the Federal Water Pollution Control Act to encourage the use of dike disposal facilities. See *infra*, pp. 1290–1291.

In construing Sections 9 and 10, we are guided by the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

The Corps' interpretation deserves more than usual deference in this case for several reasons. It drafted the bill which became the 1899 Act, and administers both Sections 9 and 10 of the Act, and therefore has special familiarity with the interrelationship between the two sections. The Corps has interpreted and administered the Act consistently for a period of over eighty years. The Supreme Court, in *Wisconsin v. Illinois, supra,* specifically sanctioned reliance upon the Corps' administrative interpretation and administration of the Act. As early as 1916 the Secretary of War made the Corps' view known to Congress. Judge Koonce's speech, for example, stating the Corps' interpretation that Section 9 only applies to structures which extend completely across a waterway, was submitted to Congress during 1971 hearings on water pollution control legislation. See *supra,* p. 1286–1287.

The legislative history of the Federal Water Pollution Control Act Amendments of 1972 demonstrates that Congress was not only aware of, but approved and encouraged the Corps' practice of issuing permits for diked disposal areas, without specific Congressional approval. Section 404(a) of the FWPCA, 86 Stat. 816, 884, 33 U.S.C. § 1344(a), provided:

> The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.[11]

In the House, Representative Vanik spoke to federally funded programs to halt the open-water disposal of dredged spoil. He sought and received assurances that Section 404 would not terminate the Corps' existing program of placing polluted dredgings "in dike or land sites," as opposed to open water dumping. Legislative History of the Water Pollution Control Act Amendments of 1972, p. 421. He stated that the Corps of Engineers gave him "a list of the harbors where dredgings were being placed in land or diked disposal sites," and inserted the data in the Congressional Record. Representative Vanik's concern was that not enough harbors were included in the program. *Id.* at 422.

During Senate consideration of the Conference Report, Senator Muskie, the primary Senate manager for the bill, reported:

> The Conferees were uniquely aware of the process by which the dredge and fill permits are presently handled and did not wish to create a burdensome bureaucracy in light of the fact that a system to issue permits already existed.

> .    .    .    .    .

> At the same time, the Committee expects the Administrator (of the Environmental Protection Agency) and the Secretary (of the Army) to move expeditiously to end the process of dumping dredged spoil in water—to limit to the greatest extent possible the disposal of dredged spoil in the navigable inland waters of the United States including the Great Lakes—to identify land-based sites for the disposal of dredged spoil and, where land-based disposal is not feasible, to establish diked areas for such disposal.

All of these alternatives are available. 118 Cong.Rec. 33699 (1972). Congress, when it authorized the Baltimore Harbor Channel Project in 1970, gave an indication of its understanding that its further approval was not needed for diked disposal facilities. That Congress expected the dredged spoil to be placed behind retaining structures such as the dike at issue here is shown in the House Report:

> *Local cooperation.*—Provide without cost of all lands, easements, and rights-

---

11. In 1977 Congress amended this section, in immaterial ways that are not relevant here. 33 U.S.C. § 1344(a), Pub.L. 95–217, 91 Stat. 1566.

of-way for construction and maintenance of the project and for aids to navigation, including spoil disposal areas, retaining dikes, bulkheads and embankments or the costs of such retaining works. . . .

H.R.Rep. No. 1665, 91st Cong., 2d Sess., 10 (1970).

For most of this century at least, Congress has been aware of the Corps' interpretation of the Act. When it amended the Federal Water Pollution Control Act, Congress was well acquainted with the prevailing Corps' practice of authorizing diked disposal areas pursuant to Section 10 of the 1899 Act. Congress has never interfered with this long-standing administrative practice. Even if it has not in terms ratified the Corps' practice, Congress at least considers the practice to be consistent with the Act. See *Boesche v. Udall*, 373 U.S. 472, 483, 83 S.Ct. 1373, 1379, 10 L.Ed.2d 491 (1963).

Sections 9 and 10 of the Rivers and Harbors Act of 1899 must be construed together in a logical and consistent manner in order to best effectuate the intent of Congress. A logical distinction between those structures listed in Section 9 (which require Congressional approval) and those listed in Section 10 (which do not) is that the former class of structures completely span a waterway, while the latter do not. Section 9 structures are capable of completely blocking a navigable waterway, while Section 10 structures merely protrude into a waterway and require only a rerouting of waterborne traffic. Since Section 9 structures usually necessarily destroy navigation, they require Congressional approval. Since Section 10 structures do not usually or necessarily destroy, but merely obstruct, navigation, they require only Corps approval.

Finally, as the *Petterson* court noted, the expansive reading of Section 9 put forward by the plaintiffs could render Section 10 meaningless, since structures such as jetties, breakwaters, and fills would be covered by Section 9 although they are literally within Section 10. Limiting Section 9 to waterway-spanning structures, as the Corps has done, provides a clear, convenient, and workable distinction between Section 9 and Section 10. This construction is reasonable and is supported by the legislative history of the statute.

We hold that the Corps of Engineers acted correctly in processing the application for the Hart and Miller Islands diked disposal facility under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. Accordingly the judgment appealed from is

*REVERSED.*